Disciplinary Counsel v. McCauley.

[Cite as Disciplinary Counsel v. McCauley,
114 Ohio St.3d 461, 2007-Ohio-4259.]

(No. 2007-0336—Submitted April 17, 2007—Decided August 29, 2007.)

**Per Curiam.**

{¶ 1} Respondent, Christopher James McCauley of Brecksville, Ohio, Attorney Registration No. 0034632, was admitted to the practice of law in Ohio in 1986. The Board of Commissioners on Grievances and Discipline recommends that we indefinitely suspend respondent's license to practice law based on findings that he repeatedly withdrew funds from his client trust account and improperly used the money for his personal and business expenses. On review, we agree that respondent committed professional misconduct as found by the board and that an indefinite suspension is appropriate.

{¶ 2} Relator, Disciplinary Counsel, charged respondent with five counts of professional misconduct. Respondent admitted most of the charges but disputed that he had violated DR 1–102(A)(4) (a lawyer shall not engage in fraud, deceit, dishonesty, or misrepresentation), as alleged in Counts I, II, III, and V. The parties jointly proposed an indefinite suspension.

{¶ 3} A three-member panel of the board heard the cause and made findings of fact and conclusions of law and recommended an indefinite suspension. The board adopted the panel's findings of misconduct and recommendation. No objections have been filed.

## Misconduct

{¶ 4} During the underlying events, respondent practiced law as McCauley & Associates Co., L.P.A., providing general legal representation to clients and debt collection services to several businesses. In particular, respondent represented Christina Erhardt in obtaining proceeds from some retirement accounts and

collected debts for United Consumer Financial Services ("UCFS") and Alterra Healthcare. In administering his practice, respondent maintained an Interest on Lawyer Trust Account ("IOLTA") account for entrusted client funds and an operating account for his office at American National Bank.

## Count I

{¶ 5} Count I alleged that respondent improperly administered his IOLTA account while managing his law firm's practice. Respondent admitted that between January 1, 2002, and December 31, 2005, he commingled funds and used money from his IOLTA account to pay personal and business expenses. Specifically, respondent wrote or authorized 21 checks payable to himself for a total of $13,580, 11 checks for a total of $3,275 in cash, and two checks totaling $22,000 to repay a personal loan from his client trust account. Respondent arranged for electronic transfers totaling $4,358 to pay the law firm's utility bills and wrote or authorized seven checks totaling $3,475 to pay a combination of personal and office expenses, a check for $3,950 for office rent, and another $100 check to an attorney in his firm. Respondent additionally overdrew his IOLTA account nine times during this period, incurring $252 in bank fees as a result.

{¶ 6} The parties stipulated that respondent violated the following Disciplinary Rules relative to Count I: DR 1–102(A)(5) (a lawyer shall not engage in conduct that is prejudicial to the administration of justice), 1–102(A)(6) (a lawyer shall not engage in conduct that adversely reflects upon his fitness to practice law), and 9–102(B)(3) (a lawyer shall maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them). We accept the stipulations. Moreover, because respondent violated DR 9–102(A) (all client funds in a lawyer's possession, other than funds advanced for costs or expenses, must be deposited and maintained in a separate identifiable bank account), we also agree that respondent violated that Disciplinary Rule. Finally as to Count I, we agree with the board that by withdrawing client-entrusted funds for his personal and his law firm's use, respondent acted dishonestly in violation of DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).

## Counts II, III, and V

{¶ 7} Counts II, III, and V arise out of respondent's debt collection services for UCFS and Alterra and his representation of Erhardt.

{¶ 8} UCFS, the grievant in Count II, and Alterra, the grievant in Count III, consigned accounts receivable to respondent for collection and payment. Respondent arranged with both clients to deduct an agreed-upon percentage from the collection proceeds for his fee and to remit the remainder to the clients.

Respondent agreed to accept one-third to one-half of the collected funds, depending on the circumstances, as payment from UCFS, and one-third of the collected funds from Alterra. Respondent employed attorneys and administrative staff to pursue the accounts receivable through debtor contact, legal action, and collection proceedings after judgment.

{¶ 9} Respondent began collecting consumer installment sales accounts for UCFS in June 2002, when UCFS referred approximately 15,000 accounts to him. Between July 2002 and May 2004, respondent collected nearly $400,000 for UCFS but remitted only $23,949, far less than he owed under their agreement. In early 2004, UCFS contacted respondent about the shortfall, and respondent and representatives of UCFS audited his accounts together to verify the amount due to UCFS. On May 15, 2004, respondent signed a cognovit promissory note for the benefit of UCFS for $197,315, to be paid in 12 monthly installments of $16,533.

{¶ 10} Respondent or an administrative employee regularly transferred fee income as earned from clients like UCFS and Alterra from the law firm's IOLTA account to the law office operating account to pay the law firm's bills. But after the promissory note had been signed, the burden of making installment payments to UCFS depleted the operating account at times to the extent that respondent's law firm could not pay monthly expenses, including payroll. When operating expenses exceeded the funds available in the operating account, either respondent or an employee acting with his authority would transfer as yet unearned funds from the IOLTA account to cover the expenses. Respondent rationalized these withdrawals as "advances," because his staff typically reconciled the IOLTA account and operating accounts each month, without any carryover.

{¶ 11} Eventually, respondent's law firm defaulted on the monthly payments due UCFS under the promissory note, and UCFS obtained a $178,054 judgment against respondent on the note. UCFS also sued respondent for malpractice, conversion, fraud, and breach of contract, claims that respondent and UCFS resolved through a consent judgment requiring respondent to pay an additional $35,049.

{¶ 12} The parties stipulated that respondent violated the following Disciplinary Rules relative to UCFS and Count II: DR 1–102(A)(5), 1–102(A)(6), 9–102(B)(3), and 9–102(B)(4) (a lawyer shall promptly pay or deliver to the client as requested by the client the funds, securities, and other properties in the possession of the lawyer which the client is entitled to receive). We accept those stipulations. Also as to Count II, we find that respondent violated DR 1–102(A)(4) by misappropriating entrusted client funds and using the unearned money to pay creditors.

{¶ 13} In trying to satisfy his obligations to UCFS, other clients, and creditors, respondent also misused funds rightfully belonging to Alterra. In January 2005, respondent collected $5,000 from an Alterra debtor and deposited the funds in his IOLTA account. Within days of the deposit, respondent transferred $6,000 to his operating account, leaving just $405.65 in the IOLTA account. Respondent did not at that time pay Alterra any of the $5,000 proceeds.

{¶ 14} In another instance, respondent used Alterra's funds to repay money his law firm owed Erhardt, the grievant in Count V. Respondent agreed in June 2004 to liquidate two retirement accounts for Erhardt in exchange for a 25 percent contingency fee. In July, respondent received an $80,000 check from one of the accounts, $60,000 of which belonged to Erhardt under their agreement, and deposited that amount into his IOLTA account.

{¶ 15} At about the same time, respondent's bank made a serious error by depositing a large amount of money belonging to another customer, approximately $60,000, into respondent's law office operating account. Respondent optimistically ignored the error, despite the marginal financial condition of his law firm, and authorized those funds for payment of the law firm's creditors. He also authorized a $60,000 check to Erhardt drawn on the operating account. Apparently because payments to UCSF and other creditors had depleted the operating account, the bank dishonored Erhardt's check.

{¶ 16} Respondent had insufficient funds to repay the bank when it discovered the erroneous deposit into respondent's operating account. He thus acquiesced as the bank debited $56,000 from his IOLTA account as a correction. The debit left respondent's IOLTA account with a balance of only $31,000, far less than the amount required to compensate Erhardt.

{¶ 17} Erhardt hired new counsel to collect the unpaid retirement account proceeds. The new lawyer sued respondent, who eventually agreed to make payments toward retiring the debt to Erhardt. Between November 2004 and April 2005, respondent paid off the debt in installments, always using cashier's checks or checks drawn on his law firm's operating account.

{¶ 18} Some of the funds used to pay Erhardt traced back to a $35,000 check that respondent had collected from an Alterra debtor on March 28, 2005. On that day, respondent both deposited the $35,000 check in his IOLTA account and transferred $12,000 from the IOLTA account to his operating account. Then, on April 4, 2005, he wrote a $22,000 check from his IOLTA account to purchase a cashier's check with which he finished paying Erhardt. Respondent's IOLTA account balance dropped to $1,463.33, demonstrating his patent misappropriation of client resources. Again, respondent did not then pay Alterra any of the $35,000 in debtor proceeds.

{¶ 19} Respondent has now paid all sums owed to UCFS, including attorney fees. As far as he knows, respondent has completely repaid Alterra for the collection losses his law firm caused. During the panel hearing, respondent attributed his misconduct to poor office management practices and his inattention to fiscal operation of his law firm, not dishonesty.

{¶ 20} The parties stipulated to violations of the following Disciplinary Rules relative to Alterra and Count III, as well as to Erhardt and Count V: DR 1–102(A)(5), 1–102(A)(6), 9–102(B)(3), and 9–102(B)(4). With respect to Count V, the parties also stipulated that respondent violated DR 2–106(A), an acknowledgement that his routine services for Erhardt did not justify a $20,000 fee. We accept those stipulations. Moreover, we find a violation of DR 1–102(A)(4) as to both Counts III and V, because respondent deprived his clients of funds belonging to them so that he could pay his law firm's creditors.

### Count IV

{¶ 21} The parties also stipulated to a violation of Gov.Bar R. V(4)(G), which requires a lawyer to cooperate in an investigation of professional misconduct. We also accept that stipulation. Though he has since participated appropriately in these proceedings, respondent initially ignored or failed to sufficiently respond to relator's letters of inquiry about the underlying grievances.

### Sanction

{¶ 22} Disbarment is the presumptive sanction for an attorney's misappropriation of client funds, but significant mitigating circumstances may permit an indefinite suspension. *Cincinnati Bar Assn. v. Rothermel,* 104 Ohio St.3d 413, 2004-Ohio-6559, 819 N.E.2d 1099, ¶ 18, citing *Cleveland Bar Assn. v. Dixon,* 95 Ohio St.3d 490, 2002-Ohio-2490, 769 N.E.2d 816, ¶ 15.

{¶ 23} Relator and the board urge us to indefinitely suspend respondent's license to practice law, and the board further recommends that respondent be required to take 12 hours of accredited continuing legal education in office management and the proper administration of an IOLTA account. The board cites the mitigating factors that respondent has no prior disciplinary record, he ultimately cooperated in the disciplinary proceedings, and he acknowledged his wrongdoing and expressed his remorse with conviction. Respondent also admitted the amounts owed to his clients and has made complete restitution to the best of his knowledge. The board implicitly found that these mitigating features outweighed the aggravating effect of respondent's multiple offenses and pattern of misconduct. See Section 10(B)(1) and (2) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline.

{¶ 24} We accept the board's recommendation. Respondent is therefore indefinitely suspended from the practice of law in Ohio, and, pursuant to Gov.Bar R. V(10)(B), he may not petition for reinstatement to the Ohio bar for two years from the date of our order. In any petition for reinstatement that respondent may file, in addition to meeting the requirements of Gov.Bar R. V(10), he must show that he has completed at least 12 hours of accredited continuing legal education in office management and the proper administration of an IOLTA account. Those hours shall be in addition to the continuing legal education requirements of Gov.Bar R. X(3)(G). Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER and CUPP, JJ., concur.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Robert R. Berger, Assistant Disciplinary Counsel, for relator.

Burdon & Merlitti and James L. Burdon, for respondent.