CLEVELAND METROPOLITAN BAR ASSOCIATION *v.* WRENTMORE.

[Cite as *Cleveland Metro. Bar Assn. v. Wrentmore,* 138 Ohio St.3d 16,

2013-Ohio-5041.]

*Attorneys—Misconduct—Multiple disciplinary violations—Misappropriation of client funds—Failure to pay for legal-education seminars—Indefinite suspension.*

(No. 2013-0230—Submitted April 12, 2013—Decided November 21, 2013.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 11-093.

_____

**Per Curiam**.

{¶ 1} Respondent, James Clarence Wrentmore of Mayfield Heights, Ohio, Attorney Registration No. 0046779, was admitted to the practice of law in Ohio in 1990. In a six-count amended complaint, relator, Cleveland Metropolitan Bar Association, alleged multiple violations of the Rules of Professional Conduct relating to his handling of client funds and his failure to pay for five continuing-legal-education ("CLE") seminars he attended. The parties stipulated to numerous facts and to four rule violations. Wrentmore did not stipulate that he engaged in conduct adversely reflecting on his fitness to practice law or that his conduct involved dishonesty, fraud, deceit, or misrepresentation, as charged in the amended complaint.

{¶ 2} Following the hearing, the panel concluded that relator had proven all six counts by clear and convincing evidence. The board agreed with and adopted the panel's findings of fact, conclusions of law, and recommendation of an indefinite suspension. No objections have been filed.

**{¶ 3}** Upon our independent review of the record, we adopt the board's findings of fact and misconduct and agree that the appropriate sanction is an indefinite suspension.

### Misconduct

*Client-Refund Checks*

**{¶ 4}** Between May 2006 and July 2010, Wrentmore was successively an attorney with two different law firms that represented homeowner associations in real estate matters, including foreclosure cases. These firms maintained IOLTA or client trust accounts for handling client funds. Wrentmore represented clients in litigation, and occasionally courts would return excess funds that had been paid in cases on which he had served as counsel. From January to May 2010, Wrentmore received four refund checks, in amounts ranging from $5 to $2,644.74. In each case, he either cashed the check and kept the cash or deposited a substantial portion of the check into his personal account and kept a portion in cash, thereby failing to notify and promptly deliver the funds to the person having a lawful interest in the funds.

**{¶ 5}** In the incident that initiated the grievance underlying this case, Wrentmore's legal assistant sent him an e-mail inquiring about a check from the clerk of court of the Lorain County Court of Common Pleas in the amount of $2,644.74 that she had earlier passed on to him. This check was a refund payment in a case in which Wrentmore had represented a party while with his prior law firm. He responded with an e-mail on June 8, 2010, stating, "I dropped [the check] in an envelope and forwarded it," even though five days earlier, he had endorsed the check, taken a portion in cash, and deposited the remainder into his personal account. Ordinarily, if a refund check was for a client of the law firm, the legal assistant would look up the client number and forward the check to the office manager for crediting to the client matter. If a refund check was not for a client of the firm, she would give the check to the attorney whom the check was

2

made out to, and the attorney would normally return it to her and tell her where to send it.

{¶ 6} Because it was unusual for an attorney to handle a refund check in the manner Wrentmore had, the law firm contacted the clerk's office of the Lorain County Court of Common Pleas to see whether the check had been cashed and found that it had been. The firm also obtained a copy of the back side of the check and discovered that Wrentmore had endorsed it and had deposited most of the funds into his personal bank account and taken the rest in cash. The firm contacted Wrentmore's prior firm and verified that that firm had never received the refund check. On July 23, 2010, two partners from his firm confronted Wrentmore, and when he could not satisfactorily explain his actions, terminated him. He was escorted back to his office and then was escorted out of the building with only his briefcase; he was not permitted to remove any other items from his office.

{¶ 7} The firm's partner in charge of litigation and Wrentmore's legal assistant extensively searched Wrentmore's desk and his office looking for other refund checks but found no checks, envelopes with large amounts of cash, or money other than loose change. The firm boxed up and shipped Wrentmore's personal effects to his home a few days later. On July 30, 2010, Wrentmore used cash to purchase three postal money orders that totaled $2,644.74—the amount of the refund check—and the next day, he remitted the money orders to the law firm where he had worked while representing that client.

{¶ 8} The president of the firm that had terminated him subsequently filed a grievance with relator in September 2010. During the investigation of the grievance, the investigator sent Wrentmore a letter informing him that she had initiated a search of Lorain County court records for refund checks made payable to him, that she had discovered that he had received and endorsed two other checks (one for $111 and one for $857), and that his personal checking account

number was on those checks. Those checks, as with the later check for $2,644.74, were for cases in which Wrentmore had no longer been representing the clients. In the letter, she asked him to explain how he had handled those funds. He claimed in a subsequent conversation with her that he had not cashed other client checks and that he did not know anything about those two other checks. After receiving the investigator's letter, however, Wrentmore on June 27, 2011, used cash to purchase postal money orders in the amount of each of the two checks that he had negotiated and mailed the money orders to the firm where he had worked while representing those clients, claiming that he had been holding the money "as segregated funds" and that "the funds were always safe."

{¶ 9} As to a fourth client-refund check in the amount of $5, which Wrentmore had cashed, the investigator did not inquire about it at the time she questioned him about the other two checks because she was not aware of it and Wrentmore never apprised her of it when she questioned him. She later found out about that check when she was going through his bank records while investigating his other transactions.[1]

*CLE Seminars*

{¶ 10} Between April 14 and 28, 2011, Wrentmore attended five CLE seminars sponsored by the Ohio State Bar Association ("OSBA"). On the first three of those occasions, Wrentmore appeared on the day of the event and told OSBA personnel staffing each seminar that he had preregistered and prepaid for the seminar. Although he stated at the disciplinary hearing that he "believed" that he had given his debit-card number to OSBA staff members for each seminar, after each one, the OSBA discovered that its records did not reflect that Wrentmore had preregistered or that he had ever paid. The OSBA sent him a

---

1. On October 8, 2011, Wrentmore purchased a $5 postal money order. He testified at the disciplinary hearing that he sent that money order to the law firm that he had worked for while previously representing the client to cover the $5 refund check.

separate invoice for each of the three seminars. These three invoices, totaling $845, each stated that he was a "walk-in no payment." He did not promptly respond to any of these OSBA invoices.

{¶ 11} On each of the last two of the five occasions, Wrentmore paid the seminar fee with a check from his personal checking account. Both checks, amounting to a total of $544, were returned to the OSBA for insufficient funds. When apprised of the insufficient funds by the OSBA in a letter that requested payment, Wrentmore did not promptly respond. When he attended the seminars, he was working as a golf caddy at a country club. He stated at the disciplinary hearing that he was not paying close attention to his bank-account balance at that difficult time in his life when his cash flow was "pretty tight," and he claimed that he had believed that there were funds in his account to cover the checks.

{¶ 12} Despite not having paid for the CLE seminars he attended, Wrentmore reported at least a portion of the CLE hours to the Supreme Court of Ohio's Commission on Continuing Legal Education in order to receive CLE credit for those seminars. It was only after the OSBA requested that the commission revoke those CLE hours for nonpayment, more than nine months after he was initially advised of his failure to pay for the first seminar, that Wrentmore paid for all five seminars with a bank check.

{¶ 13} The panel found by clear and convincing evidence that Wrentmore's conduct violated Prof.Cond.R. 1.15(a) (requiring a lawyer to hold property of clients in an interest-bearing client trust account, separate from the lawyer's own property), 1.15(d) (requiring a lawyer to promptly deliver funds or other property that the client is entitled to receive), 8.1(a) (prohibiting knowingly making a false statement of material fact in connection with a disciplinary matter), 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law), 8.4(b) (prohibiting a lawyer from committing an illegal act that reflects adversely on the lawyer's honesty or

trustworthiness), and 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

{¶ 14} Although Wrentmore stipulated to the first four violations, he did not stipulate to the last two. The panel found that he had misappropriated funds from four client-refund checks and committed theft of services when he deprived the OSBA, without its consent and by deception, of the money he should have paid for the CLE seminars, thereby committing illegal acts for purposes of Prof.Cond.R. 8.4(b). The panel found that he had stolen client funds, lied to his employer and relator's investigator, and used the funds for his own benefit, thereby violating Prof.Cond.R. 8.4(c). The board adopted the findings of fact, conclusions of law, and recommendation of the panel and recommends that Wrentmore be indefinitely suspended from the practice of law.

{¶ 15} We adopt the board's findings of fact and misconduct.

### Sanction

{¶ 16} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

{¶ 17} The parties did not stipulate to a sanction. The board found numerous aggravating factors: a dishonest or selfish motive, a pattern of misconduct, the commission of multiple offenses, a lack of cooperation in the disciplinary process, the submission of false statements, a refusal to acknowledge the wrongful nature of his conduct, and a failure to make timely restitution. *See* BCGD Proc.Reg. 10(B)(1)(b), (c), (d), (e), (f), (g), and (i). The board found three mitigating factors: the absence of a prior disciplinary record, the ultimate payment

of restitution, and cooperation in the proceedings. *See* BCGD Proc.Reg. 10(B)(2)(a), (c), and (d).

{¶ 18} We recognize that during disciplinary proceedings, a respondent can at times be cooperative and at other times be uncooperative. But the evidence establishes that Wrentmore was less than forthcoming throughout the process, so we give little weight to cooperation as a mitigating factor here. We also note that although Wrentmore ultimately paid restitution, he did so for most of the incidents only when he found out that relator was aware of his misconduct. With respect to payment to the OSBA, he waited more than nine months after he had received the first invoice before he paid for the seminars. And with respect to the former clients' refund checks, he held some of the funds for more than a year before repaying the clients. BCGD Proc.Reg. 10(B)(2)(c) requires that the payment of restitution be *timely* to be deemed mitigating; we cannot consider Wrentmore's client repayments and the payment to the OSBA to be timely in view of the lengthy delays, so we give little weight to that mitigating factor as well. *See Cleveland Bar Assn. v. Dixon*, 95 Ohio St.3d 490, 2002-Ohio-2490, 769 N.E.2d 816, ¶ 21 ("Although [respondent's] having made restitution provides *some* mitigation, the circumstances surrounding the repayment determine its weight" [emphasis sic]).

{¶ 19} "Disbarment is the presumptive sanction for an attorney's misappropriation of client funds, but significant mitigating circumstances may permit an indefinite suspension." *Disciplinary Counsel v. McCauley*, 114 Ohio St.3d 461, 2007-Ohio-4259, 873 N.E.2d 269, ¶ 22. Here, the board recommends an indefinite suspension, in part to allow Wrentmore to complete his contract with the Ohio Lawyers Assistance Program ("OLAP") and to continue his counseling and treatment for depression.

{¶ 20} When an attorney has engaged in numerous acts of misconduct in converting law-firm funds and there is significant mitigation, we have held that an

indefinite suspension can be appropriate. *Akron Bar Assn. v. Smithern*, 125 Ohio St.3d 72, 2010-Ohio-652, 926 N.E.2d 274, ¶ 14. In *Smithern*, we indefinitely suspended an attorney who converted fees from more than 30 clients totaling about $108,000 over a two-year period. *Id.* at ¶ 5. *Accord Toledo Bar Assn. v. Crossmock*, 111 Ohio St.3d 278, 2006-Ohio-5706, 855 N.E.2d 1215, ¶ 3 (indefinite suspension imposed for attorney's misappropriation of more than $300,000 in law-firm funds over a ten-year period); *Disciplinary Counsel v. Yajko*, 77 Ohio St.3d 385, 386, 389, 674 N.E.2d 684 (1997) (indefinite suspension imposed for misappropriating more than $21,000 in law-firm funds on 20 separate occasions from 20 clients over a seven-year period). Although Wrentmore's misconduct was not as frequent as that in *Smithern*, *Crossmock,* and *Yajko* and took place over a shorter time period, and although this case does not involve the large amounts of money misappropriated in those cases, we find that his conduct and the numerous aggravating factors here are sufficiently substantial so as not to distinguish this case from those.

{¶ 21} We are also troubled by Wrentmore's continued misrepresentation of his intentions and motives regarding his theft of client-refund checks, despite clear evidence that he used the funds for his own benefit. The most telling example of this misrepresentation is his continued adherence to his story that the funds were kept segregated, that he never spent the money, and that he always intended to repay the former clients. The easiest and most logical course for him would have been to take the name of the case and case number from the face of each check, ask his assistant to track down where the check should go, and then have the assistant forward the check. When directly asked, Wrentmore simply could not explain why he did not take those actions.

{¶ 22} Instead, Wrentmore's story offered in the disciplinary proceedings is that because he did not know who should receive the money, he cashed each check or deposited funds in his *personal* checking account to be withdrawn later,

then took the cash back to his office and placed it in separate envelopes, which he then stored in his desk, presumably to reimburse each former client at some point in the future when he would purchase a U.S. postal money order and would either mail or hand-deliver it to the recipient. He claims that when his personal effects were returned to him upon his termination, the envelopes containing the money were not there, yet the legal assistant and partner who diligently searched his office immediately after his departure found no envelopes stuffed with cash. This scenario at best defies logic, and the evidence refuting his explanation is overwhelming.

{¶ 23} We are equally troubled by his failure to acknowledge his deception in seeking access to the seminars with the intent of receiving "free" CLE credit. His explanation lacks credibility, and his self-serving statements and misrepresentations are indicative of a calculated attempt to avoid accepting responsibility for his misconduct. We do not countenance such behavior. *See, e.g., Cleveland Metro. Bar Assn. v. Gruttadaurio*, 136 Ohio St.3d 283, 2013-Ohio-3662, 995 N.E.2d 190, ¶ 47, 50-51 (indefinite suspension imposed on attorney who committed multiple acts of dishonesty, including making self-serving statements and misrepresentations in the course of disciplinary proceedings).

{¶ 24} Having weighed the aggravating and mitigating factors in this case and having considered the sanctions previously imposed for comparable conduct, we adopt the board's recommended sanction of an indefinite suspension.

{¶ 25} Accordingly, we indefinitely suspend James Clarence Wrentmore from the practice of law. We condition any future reinstatement on the submission of proof that Wrentmore has complied with the requirements of his OLAP contract.

{¶ 26} Costs are taxed to Wrentmore.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Tucker Ellis, L.L.P., and John Q. Lewis, for relator.

James C. Wrentmore, pro se.

_____