[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Smith,* **Slip Opinion No. 2017-Ohio-9087.**]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-9087

DISCIPLINARY COUNSEL *v.* SMITH.

[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Smith,* **Slip Opinion No. 2017-Ohio-9087.**]

(No. 2014-0197—Submitted April 5, 2017—Decided December 19, 2017.)

*Attorneys—Misconduct—Conduct involving dishonesty, fraud, deceit, or misrepresentation—Conduct adversely reflecting on fitness to practice law—Charging an excessive fee—Attorney who engaged in unethical and fraudulent billing practices suspended from the practice of law for two years and ordered to pay restitution.*

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2011-072.

_____

**Per Curiam.**

{¶ 1} Respondent, Scott Clifford Smith of Pepper Pike, Ohio, Attorney Registration No. 0039828, was admitted to the practice of law in Ohio in 1988. In

August 2011, relator, disciplinary counsel, charged Smith with multiple violations of the Rules of Professional Conduct and the Disciplinary Rules of the Code of Professional Responsibility, arising from his alleged use of unethical billing practices and charging of excessive fees in five separate cases involving three clients who operated nursing homes in Ohio.

{¶ 2} The Board of Professional Conduct found that Smith engaged in the charged misconduct, and it recommended that Smith be indefinitely suspended from the practice of law and required to make restitution to his former firm, which had issued substantial refunds to the affected clients. After this court remanded the cause to allow for additional discovery, *see Disciplinary Counsel v. Smith*, 143 Ohio St.3d 325, 2015-Ohio-1304, 37 N.E.3d 1192, ¶ 15, a panel of the board conducted a second hearing and issued a report reaffirming its original findings and recommending the same sanction.

{¶ 3} Smith objects to the board's findings and recommended sanction and argues that (1) the findings are based on insufficient evidence and are against the manifest weight of the evidence, (2) his former firm and clients thwarted his attempts to obtain discovery after this court remanded the cause for that purpose, thereby depriving him of due process, and (3) the ethical violations found by the board do not support the recommended sanction.

{¶ 4} For the reasons that follow, we sustain Smith's objection to the recommended sanction but overrule his remaining objections. We adopt the board's findings of fact and misconduct and find that a two-year suspension from the practice of law and an order that Smith pay $20,796.50 in restitution to his former law firm is the appropriate sanction in this case.

**Procedural History and Findings of Fact and Misconduct**

{¶ 5} Smith joined the law firm of Weston Hurd, L.L.P., in 1989, became a partner in 1996, and served as the firm's managing partner from 2004 or 2005 until his resignation in 2007. In March 2007, a member of Smith's practice group

informed partner Victor DiMarco that Smith had altered firm billing records to take credit for work that DiMarco had performed as an associate at the firm. DiMarco reviewed the billing records and alerted the firm's management committee of apparent irregularities. The firm commenced an internal investigation into Smith's billing practices and, on the advice of outside ethics counsel, reviewed the billing records in five of Smith's cases: *Seigmund v. Edgewood Manor Nursing Home*, Ottawa County Court of Common Pleas case No. 06-CV-087; *Maxey v. Altercare of Canton*, Stark County Court of Common Pleas case No. 2006-CV-03231; *Lawson v. Altercare of Wadsworth Ctr. for Rehabilitation & Nursing Care, Inc.*, Medina County Court of Common Pleas case No. 05-CIV-0980; *Hanson v. Valley View Nursing & Rehabilitation Ctr.*, Summit County Court of Common Pleas case No. CV-2005-03-1379; and *Heppner v. Beverly Enterprises-Ohio, Inc.*, Lake County Court of Common Pleas case No. 05-CV-002059.[1] Smith participated in the investigation to some degree but resigned after the firm informed him that it would be contacting his clients about the billing irregularities.

{¶ 6} As part of the investigation, the firm examined the bills for 88 cases involving the three clients at issue, identified the suspicious entries in each bill, and met with the clients to discuss their findings. The firm reduced the questionable time by 50 to 60 percent and ultimately issued refunds totaling more than $350,000 to the affected clients. The firm also filed the grievance that gives rise to this disciplinary action.

{¶ 7} In the resulting disciplinary complaint, relator alleged that while Smith was employed by Weston Hurd, he billed work as his own though it had actually been performed by another attorney, billed time in excess of the time actually spent on particular tasks, billed for work that was never performed by

---

[1] These five case files pertain to three long-term-care clients: Beverly Enterprises of Ohio, Inc., Altercare of Ohio, Inc., and Covenant Care, Inc.

anyone at the firm, and billed multiple cases and clients for identical services and time on the same day.

**{¶ 8}** The board found that Smith's billing narratives were false and that in some instances, his billing practices resulted in clearly excessive fees. The board also found that Smith acted in direct conflict not only with his firm's general billing practices but, more importantly, with his clients' express expectations and instructions.

**{¶ 9}** Specifically, the board found that under Weston Hurd's billing practices, attorneys tracked their billable time on handwritten sheets that included a narrative description of the tasks performed and the amount of time expended on the task. The firm's administrative staff compiled the data and generated monthly billing memoranda. After the lead attorney on a case reviewed the billing memoranda and made any necessary changes or adjustments, the firm's accounting department generated and sent invoices to the firm's clients and their affiliates, including accountants, third-party administrators ("TPAs") and monitoring counsel for the client's insurance carriers, and the individual nursing homes involved in the cases.

Tim Johnson, a Weston Hurd partner at the time of the internal investigation, participated in the review of Smith's billing records. Johnson testified that Smith used "the same terminology * * * over and over again for a lot of these different entries" and that the entries were "either at the wrong point in the litigation for what was going on" or recorded "clearly excessive time for what the activity was." He noted a "disturbing number" of instances in which Smith had recorded the same time entry and narrative on multiple files on the same day using ditto marks. Johnson also noted that while the five client files at issue in this case were available for purposes of cross-referencing time entries against work product during a meeting that the firm held with Smith in July 2007 so that he could explain his time entries, "[v]ery little [cross-referencing] happened because it became pretty

4

obvious as we went into the process, * * * there wasn't going to be anything in [the files]." In addition to those irregularities, the board also found at least one billing entry in which Smith had crossed out the initials of then-associate Victor DiMarco, replaced them with his own initials to claim credit for the work, and increased the amount of time billed for the activity.

{¶ 10} Throughout this disciplinary proceeding, Smith's testimony focused on the alleged billing practices of Beverly, which was the only affected long-term-care company to use electronic billing and document-management programs to interface with the firm. Smith claimed that he maintained bare-bones files at the firm because he uploaded the majority of his work product directly to Serengeti, a billing system, and PowerBrief, a repository for documents and pleadings. According to Smith, others at Weston Hurd had limited or no access to these systems and aside from Smith and three others, "no one else was approved to even see these * * * secret files."

{¶ 11} At his first disciplinary hearing, Smith testified that each Beverly case had a "matrix," which he described as an eight- to eleven-page document that graphed out the litigation phases. He claimed that a preapproved budget was assigned to each phase and that he would bill generically against a preapproved billing entry and matrix budget for each phase. At his deposition, Smith testified that although he believed the amount of time he billed was accurate, it would be impossible to correlate his billing narratives with work product in the file because "the narratives and the dates [attached to that time] were not relevant." He openly admitted that his billing narratives did not accurately describe his work. But he argued that his clients had requested and approved generic billing narratives to avoid revealing confidential information that might later be used to support an award of punitive damages against them under the Ohio Nursing Home Patients' Bill of Rights, codified at R.C. 3721.10 et seq. Alternatively, he suggested that the work described in a billing narrative might have been performed in a different case

altogether because Beverly allegedly instructed him to bill other matters to the company's open files.

{¶ 12} The board found Smith's explanation for his billing practices "incredible," for four reasons. First, during the firm's internal investigation, Smith "submitted exceedingly brief, unhelpful responses" to written questions and failed to adequately explain his billing practices. For example, the board noted that Smith could have logged onto Serengeti or PowerBrief to show his work product to his partners at the outset of the investigation (when he still had access to the systems) but that he never offered to do so. The board also found that he vacillated between stating that his client-confidentiality agreements prohibited him from disclosing the electronic content related to the clients' files to his partners and claiming that he did not share the databases with the firm because "[t]here was no communication, it was you're out of here."

{¶ 13} Second, the board found that Smith's testimony did not explain his billing practices for the other two affected clients—Altercare and Covenant Care—because only Beverly used the electronic billing and document-management programs that Smith claimed were the key to explaining the discrepancies. The board also noted that Smith avoided answering relator's questions about why he did not have any notes regarding his work for Altercare and Covenant Care—neither of which used the electronic systems where he claimed such documents were stored.

{¶ 14} Third, the board found that despite Smith's adamant and repeated claims that his long-term-care clients demanded secrecy in their billing and files, he never conveyed these concerns or instructions to DiMarco, who worked on all five of the cases at issue in this proceeding. Although DiMarco testified that he was generally aware of the Ohio Nursing Home Patients' Bill of Rights and the potential for punitive-damage awards in long-term-care cases, he could not recall any specific conversations with Smith regarding different billing requirements for

the firm's long-term-care clients. Furthermore, he testified that he billed all three of the affected clients in the same manner that he billed his other clients. And unlike Smith, for all three of the affected clients, DiMarco maintained complete records of all of the work he performed in hard-copy files that included pleadings, correspondence, discovery, expert reports, and his personal notes.

{¶ 15} Finally, the board noted that no witnesses corroborated Smith's version of events. Paul Killeen, Beverly's senior vice president of litigation, testified that the company expected outside counsel's billing to include a brief narrative of the work performed such that he would be able to understand what the lawyer had done and that block billing for multiple tasks was inappropriate. He rejected Smith's claims that the company routinely authorized him to bill for work on unrelated legal matters in open case files and testified that the company would instruct outside counsel to bill work to an open but unrelated file only under extremely rare circumstances. Even then, he emphasized that the company would expect the billing narrative to explain that the work related to another legal matter and to make it plain what the attorney was doing.

{¶ 16} Killeen acknowledged that his predecessor, Steve Brigance, had served as Smith's primary contact with Beverly. But Killeen testified that he inherited Beverly's billing and litigation system from Brigance and that having learned about it by working extensively with other Beverly employees for six years, he was confident that the company never had a regular billing practice like the one Smith described.

{¶ 17} John Goodman, general counsel for Altercare, also testified that his company expected narratives that gave "a fair and honest" rendition of the services that counsel provided. He expected that the billing narratives would "accurately reflect the work being done," without revealing confidential work product. And he could not recall a single instance in which he had instructed Smith to change the

number of hours recorded, change the identity of the attorney who did the work, or bill the company for work that was not performed.

{¶ 18} Covenant Care, the third client affected by Smith's conduct, refused to participate in this disciplinary proceeding. However, relator submitted an October 9, 2000 letter from the company's general counsel, Andrew Torok, to Smith, with an enclosed copy of the company's billing guidelines. Smith signed the letter to acknowledge receipt of the guidelines, which state that each monthly billing statement must contain the name and billing rate of each attorney who worked on the matter, the date that each service was performed, and a brief description of each service performed. Those guidelines also incorporated a sample billing statement, and not one of the exemplar billing entries contains the type of vague and ambiguous descriptions that Smith testified his clients demanded. The billing guidelines are also consistent with the accounts of two Weston Hurd partners who testified that *none* of the affected clients corroborated Smith's version of events at the conclusion of the firm's internal investigation.

{¶ 19} Based on evidence adduced at the hearing, the board found that Smith violated DR 1-102(A)(4) and Prof.Cond.R. 8.4(c) (both prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1-102(A)(6) and Prof.Cond.R. 8.4(h) (both prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law); and DR 2-106(A) and Prof.Cond.R. 1.5(a) (both prohibiting a lawyer from making an agreement for, charging, or collecting an illegal or clearly excessive fee).[2]

---

[2] Because respondent's misconduct occurred both before and after the adoption of the Rules of Professional Conduct on February 1, 2007, relator charged respondent under the applicable rules of both the former Code of Professional Responsibility and the current Rules of Professional Conduct. Because the corresponding charges arise out of the same course of conduct, however, we treat them as single violations.

**{¶ 20}** Smith conducted additional discovery following our remand of this case to the board, and the panel received that evidence and heard limited testimony from Smith at a June 7, 2016 hearing. The new evidence consisted largely of Beverly's written billing guidelines and codes; the written billing guidelines for Altercare and its TPA, ProClaim; examples of Smith's weekly reports to Beverly; copies of e-mails between Smith and his clients, some of which were produced by Weston Hurd before the remand and some that were produced on remand; and letters attesting to Smith's good character.

**{¶ 21}** The board flatly rejected Smith's contention that the newly discovered evidence supported his claim that his clients approved his use of vague and ambiguous billing narratives, and it reaffirmed its previous findings of misconduct. Specifically, the board found that the newly admitted billing guidelines and codes actually supported relator's contention that Smith's clients expected him to submit billing narratives that accurately reflected the work he performed on their cases and that Smith's weekly reports for Beverly could not explain his ditto-mark billing as it related to other clients that did not have comparable reporting requirements. Therefore, the board affirmed its original findings of misconduct.

**Smith's Objections**

*Sufficiency and Manifest Weight of the Evidence*

**{¶ 22}** Smith challenges both the sufficiency and the manifest weight of the evidence against him. A challenge to the sufficiency of the evidence attacks its adequacy and requires us to examine "whether the evidence is legally sufficient to support a verdict as a matter of law," while a challenge to the weight of the evidence attacks its persuasiveness and requires us to examine its "effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

**{¶ 23}** With regard to the sufficiency of the evidence, Smith primarily argues that relator failed to prove that he did not perform the tasks set out in his

billing narratives. Smith's entire defense, however, was that he and his clients had agreed that his billing narratives should be "vague and ambiguous" to ensure that plaintiffs could not use them as the basis for a punitive-damages award. Smith repeatedly testified that he billed his clients against a preapproved budget based on the phase of each case and that the narratives "were never meant to know what you did" and, in fact, "had nothing to do with what was going on." Thus, Smith admitted that his billing narratives were not merely vague or ambiguous but that they were also misleading. Those admissions are more than sufficient to establish that Smith was not performing the tasks described in his billing narratives.

{¶ 24} With regard to the manifest weight of the evidence, Smith contends that the evidence he submitted on remand corroborates his version of events and renders his testimony more credible than the relator's evidence. Specifically, he argues that the Beverly billing codes support his testimony that his clients reviewed and paid bills according to general categories rather than relying on the narratives and that the examples of the weekly reports that he prepared for Beverly confirm that his ditto- mark billing represents the time that he spent generating similar reports for his clients in those cases.

{¶ 25} The record, however, contains ample evidence to support the board's determination that Smith's explanation for his ditto-mark billing is simply not credible. Although Smith agreed that his ditto-mark billing entries did not conform to traditional notions of accuracy, he claimed that his duplicate time entries likely represented time he billed for generating periodic reports to his clients. But DiMarco testified that Beverly was the only client to require weekly reports and that DiMarco handled most of the reporting. Yet Smith's ditto-mark billing also appeared in two of Altercare's cases, and Altercare did not require such reports. And Smith's billing for those reports was clearly excessive; he billed 1.4 hours for reports that Killeen described as "10 words in a sentence[,] often being no change in this matter."

**{¶ 26}** Having thoroughly reviewed the record, we find that the board's findings of misconduct are supported by sufficient evidence and are not against the manifest weight of the evidence. Therefore, we overrule Smith's objections and adopt the board's findings.

*Discovery Issues and Due Process*

**{¶ 27}** Smith argues, as he has throughout the proceedings, that he could not adequately defend himself against relator's allegations of misconduct without full access to the hard drive of his law-firm computer and all electronic billing and document-management programs used by the long-term-care companies or their insurers' TPAs. He argues that despite his best efforts—including issuing third-party subpoenas and moving the panel to compel discovery—he was unable to obtain discovery essential to his defense. Smith further alleges that Weston Hurd and his former clients have deliberately thwarted this court's remand order by refusing to grant him access to their computer systems, files, and data and by failing to produce all e-mails pertaining to billing and to the underlying cases.

**{¶ 28}** We have held that "due process requirements in attorney-discipline proceedings have been satisfied when the respondent is afforded a hearing, the right to issue subpoenas and depose witnesses, and an opportunity for preparation to explain the circumstances surrounding his actions." *Disciplinary Counsel v. Character*, 129 Ohio St.3d 60, 2011-Ohio-2902, 950 N.E.2d 177, ¶ 76.

**{¶ 29}** Although Smith may not have received all of the documents that he sought in discovery, we note that the two clients that participated in this proceeding have addressed only *unprivileged* billing matters arising from their relationship with Weston Hurd. Because none of the affected clients has agreed to an unqualified waiver of their attorney-client privilege and they agreed only to discuss unprivileged information regarding their legal billing, Smith has no legitimate claim to full and unfettered access to their records. Nonetheless, Beverly, Altercare, and their TPAs produced a significant number of records. Beverly

provided records for in camera inspection and gave Smith a guided walkthrough of Serengeti. Beverly's TPA submitted a statement that it had made a "thorough and diligent inquiry and search of its files, and [was] unable to locate any documents, records or other information" responsive to Smith's subpoena. Altercare indicated that it did not use the electronic databases identified by Smith and that with limited exceptions, it had already produced the requested documents or no such documents existed. Altercare's TPA submitted a copy of its claims-procedure manual. Consistent with Goodman's testimony, the manual set forth the expectation that all invoices would be itemized, be supported by time sheets for each individual billing entry, and "include an accurate description of the work performed." And Smith did not avail himself of the opportunity to depose additional witnesses to further explore his claims that evidence had been concealed or destroyed.

{¶ 30} Smith also alleges that the destruction of evidence including his law-firm laptop computer and hard drive has deprived him of due process. But according to Weston Hurd, the client-related material on those devices was transferred to the firm's network file server prior to disposal and was produced during discovery. Smith has made no showing that the evidence (as opposed to the devices on which it was originally stored) was destroyed, let alone that it was destroyed in bad faith. Therefore, we find no merit to Smith's claim. *See, e.g.*, *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, syllabus (holding that in order for there to be a violation of due-process rights based on the destruction of potentially useful information, there must be a showing that it was destroyed in bad faith).

{¶ 31} Perhaps the most troubling aspect of Smith's discovery claims is his attempt to shift the focus of our inquiry from the reasonable and express expectations of the three long-term-care companies he represented to the expectations and billing guidelines of their insurers' TPAs. Smith complains that "[r]elator incorrectly attempted to use the underlying clients' billing guidelines and

12

paper files as the standard for the insurance companies' case management and billing guidelines," and he claims that that legal fees for these cases were paid by the insurance companies through their TPAs. He asserts that relator's reliance on the client's billing guidelines was therefore misplaced and irrelevant, that "[r]elator did not introduce any evidence of the TPA's or insurance companies' billing guidelines," and that the insurers' TPAs have never produced all of the relevant evidence he requested in his subpoenas duces tecum. But the entire thrust of Smith's defense is that his unorthodox billing practices were an attempt to avoid the imposition of punitive damages, and public policy prevents insurance contracts from insuring against claims for punitive damages based upon the insured's malicious conduct. *See, e.g.*, *Neal-Pettit v. Lahman*, 125 Ohio St.3d 327, 2010-Ohio-1829, 928 N.E.2d 421, ¶ 21, citing *Wedge Prods., Inc. v. Hartford Equity Sales Co.*, 31 Ohio St.3d 65, 509 N.E.2d 74 (1987), and *Rothman v. Metro. Cas. Ins. Co.*, 134 Ohio St. 241, 246, 16 N.E.2d 417 (1938). Therefore, it is the long-term-care companies—not their insurers or the insurers' TPAs—that would have the greatest interest in preventing an award of punitive damages.

{¶ 32} Although Smith now suggests that the billing guidelines of the TPAs governed his actions, his own deposition testimony belies this claim. In 2013, Smith testified that he represented the long-term-care companies—not their insurance companies—that those clients were self-insured to some degree, and that they were "direct pay clients that were 100 percent engaged in the defense of these cases." And at Smith's first disciplinary hearing, he, Goodman, and Killeen testified that Beverly and Altercare bore primary financial responsibility for their own legal fees because they had huge self-insured retentions (i.e., the amount that the insureds agreed to pay before their losses would be covered by insurance, *see Black's Law Dictionary* 1566 (10th Ed.2014)). Therefore, even if Smith believed that he had *some* duty to follow the TPAs' billing guidelines, there can be no reasonable dispute that his primary obligation was to the long-term-care clients he

represented. *See, e.g.*, Board of Commissioners on Grievances and Discipline Advisory Opinion No. 2000-3 (June 1, 2000), at p. 6 (finding that when an attorney represents an insured but is paid by an insurer, the insured is the client to whom the attorney owes a duty of loyalty and that "regardless of whether the insurer is considered a dual client or a third party payer, the attorney cannot allow the insurer to direct or regulate his or her professional judgment in legal services to the insured").

{¶ 33} Even if Smith could prove that the TPAs had instructed him to use vague or ambiguous billing narratives, that instruction would not negate our findings of misconduct for several reasons. First, his billing narratives were not vague or ambiguous—they were false. For example, in one case, Smith charged 1.4 hours in April 2006 for "[p]reparation of document discovery production, index, bate stamp production of chart, records, subpoena duces tecum, production per request for production from opposing counsel." But the docket in that case does not show that Smith produced any documents at that time. On the contrary, he had opposed the plaintiff's motion to compel discovery in March and the court did not grant that motion until August, approximately four months after Smith billed his client for producing the requested discovery. Second, Smith's clients instructed him to provide billing narratives that accurately described the work he performed for them. Finally, even if evidence suggested that Smith conspired *with* his clients to create his admittedly false billing narratives, that would not exonerate him from the charged misconduct so much as open the door to additional charges of misconduct. Based on the foregoing, we find no merit to Smith's claims that he has been denied due process in the context of this disciplinary proceeding.

## Sanction

{¶ 34} When imposing sanctions for attorney misconduct, we consider several relevant factors, including the ethical duties that the lawyer violated, the

aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 35} The board found that six aggravating factors are present. Smith acted with a dishonest or selfish motive because he received a financial benefit as a result of his misconduct. Gov.Bar R. V(13)(B)(2). He engaged in a pattern of misconduct involving multiple offenses against three separate clients over the course of several years. Gov.Bar R. V(13)(B)(3) and (4). Smith has failed to acknowledge the wrongful nature of his misconduct even though the affected clients have not corroborated his description of their billing practices. Gov.Bar R. V(13)(B)(7). His conduct caused financial harm to his clients and his firm. Gov.Bar R. V(13)(B)(8). Indeed, his firm elected to refund over $350,000 to the three affected clients based on its review of 88 separate case files, and it also lost one of the affected clients. And Smith has failed to make any restitution to his firm. Gov.Bar R. V(13)(B)(9).

{¶ 36} In mitigation, the board noted that Smith has no prior disciplinary record and that he submitted six letters attesting to his good character and reputation. Gov.Bar R. V(13)(C)(1) and (5).

{¶ 37} The panel and board recommended that Smith be indefinitely suspended from the practice of law and required to make restitution to Weston Hurd, in an amount to be determined in the course of then-pending civil litigation, as a condition of his reinstatement. In support of that sanction, the panel cited several cases in which we indefinitely suspended attorneys who had "deceived either their clients or their law firms over an extended period of time to reap a financial benefit." *See Cleveland Metro. Bar Assn. v. Wrentmore*, 138 Ohio St.3d 16, 2013-Ohio-5041, 3 N.E.3d 149; *Akron Bar Assn. v. Smithern*, 125 Ohio St.3d 72, 2010-Ohio-652, 926 N.E.2d 274; *Toledo Bar Assn. v. Crossmock*, 111 Ohio St.3d 278, 2006-Ohio-5706, 855 N.E.2d 1215; *Disciplinary Counsel v. Yajko*, 77

Ohio St.3d 385, 674 N.E.2d 684 (1997). The board stood by that recommendation after considering the additional evidence that Smith submitted on remand.

{¶ 38} Smith objects to the board's recommended sanction. He argues that because the panel chairperson issued a ruling limiting the evidence in this case to the five client matters identified in relator's complaint, the evidence regarding Weston Hurd's refund of more than $350,000 to the affected clients purportedly based on overbilling in 88 client matters should not be considered in fashioning his sanction. He further asserts that relator has not proven any specific overbilling and, consequently, argues that no restitution order is appropriate in this case.

{¶ 39} We agree that the full $350,000 that Weston Hurd refunded to the three clients affected by the charged misconduct cannot be considered in fashioning the sanction in this case because that amount includes estimated overbilling in 83 cases that were not charged in this disciplinary proceeding. However, we reject Smith's assertion that relator failed to prove any specific overbilling in the five charged cases.

{¶ 40} Although the board did not make specific findings to quantify Smith's overbilling, paragraphs 10 and 11 of relator's complaint allege that approximately 150 of the hours that Smith billed in the *Seigmund*, *Maxey*, *Lawson*, *Hanson*, and *Heppner* cases were fraudulent. Relator's evidence demonstrated that Smith billed multiple clients for the same work on the same day, billed clients for documents that were never filed with the courts (including motions that were granted before Smith allegedly drafted them), billed a client for deposition preparation more than a month after another partner had conducted the depositions, and took credit for work performed by another attorney at his firm. And relator submitted substantial documentary evidence to support those allegations.

{¶ 41} Having painstakingly examined the record, we find that there is clear and convincing evidence demonstrating that Smith fraudulently billed at least 124 hours of work in the *Seigmund*, *Maxey*, *Lawson*, and *Hanson* matters—48.5 hours

in the *Seigmund* case alone. For that fraudulent billing, we find that Smith owes restitution of $20,796.50 (27.9 hours at $150 per hour; 20.6 hours at $165 per hour; and 75.5 hours at $175 per hour) to Weston Hurd, which has already issued substantially greater refunds to the affected clients. We do not find that Smith engaged in fraudulent or excessive billing as alleged with respect to the *Heppner* matter, because we find that there is insufficient evidence to establish that Smith's alleged conversations with several medical professionals in that matter were anything but a legitimate effort to retain expert witnesses.

{¶ 42} While we acknowledge the cases that the board relied upon in recommending an indefinite suspension, we note that we have also imposed lesser term suspensions—and even partially stayed term suspensions—for comparable misconduct. For example, in *Cincinnati Bar Assn. v. Washington*, 109 Ohio St.3d 308, 2006-Ohio-2423, 847 N.E.2d 435, we suspended an attorney for two years with 18 months stayed on conditions for billing multiple insurance-company clients at least $91,000 over more than 18 months for work that he did not perform. But in that case, the board found and we agreed that Washington's diagnosed cocaine and alcohol dependency were a primary cause of his misconduct. *Id.* at ¶ 6. And that mitigating factor, combined with the absence of a prior disciplinary record, payment of full restitution, and full disclosure and a cooperative attitude during the disciplinary process ultimately outweighed the aggravating factors of a dishonest or selfish motive and a pattern of misconduct. *Id.*

{¶ 43} We have also imposed a two-year suspension with one year stayed on conditions and ordered payment of $50,000 in restitution based on an attorney's two-year pattern of overbilling for court-appointed work. *Dayton Bar Assn. v. Swift*, 142 Ohio St.3d 476, 2014-Ohio-4835, 33 N.E.3d 1, ¶ 9, 15, 23. Although Swift engaged in conduct that was prejudicial to the administration of justice by making false statements in the billing entries he submitted to several tribunals, we found that he made full and free disclosure to the board, demonstrated a cooperative

attitude toward the disciplinary proceedings, and submitted affidavits from four judges attesting to his good character apart from the charged misconduct. *Id.* at ¶ 15, 19.

{¶ 44} By contrast, in *Dayton Bar Assn. v. Rogers*, 116 Ohio St.3d 99, 2007-Ohio-5544, 876 N.E.2d 923, we disciplined an attorney who intentionally and fraudulently billed over several years for work that he did not perform in a single client matter. After being accused of wrongdoing, Rogers refunded more than $18,000 to the client and submitted letters from two attorneys attesting to his competence and professionalism. Aggravating factors, however, included an earlier public reprimand for charging a fictitious consulting fee, a dishonest or selfish motive, a pattern of misconduct, Rogers's refusal to acknowledge the wrongful nature of his misconduct, and the harm he caused to vulnerable clients. *Id.* at ¶ 11, 16. Noting that Rogers's "penchant for stretching the truth in his billing practices calls into doubt his fitness to remain in a profession grounded on candor and fairness" and our duty to protect the public, we suspended Rogers for two years with no stay. *Id*. at ¶ 18-19.

{¶ 45} We have carefully weighed Smith's unethical and fraudulent billing practices, which have been proven to have caused $20,796.50 in overbilling (as opposed to the $350,000 claimed by relator and Weston Hurd), our precedent, and the aggravating and mitigating factors found by the board. We also recognize that Smith has voluntarily refrained from practicing law since he resigned from Weston Hurd in August 2007. *See Disciplinary Counsel v. Pickrel*, __ Ohio St.3d __, 2017-Ohio-6872, __ N.E.3d __, ¶ 12 (affording some mitigating effect to an attorney's voluntarily refraining from the practice of law during the pendency of the disciplinary proceeding). And on these facts, we find that the appropriate sanction for Smith's misconduct is a two-year suspension from the practice of law.

**Conclusion**

{¶ 46} Accordingly, Scott Clifford Smith is suspended from the practice of law for two years and ordered to pay restitution of $20,796.50 to Weston Hurd. As a condition of reinstatement, Smith shall submit proof that he has paid the restitution in full. Costs are taxed to Smith.

Judgment accordingly.

KENNEDY, FRENCH, O'NEILL, and DEWINE, JJ., concur.

O'CONNOR, C.J., and O'DONNELL and FISCHER, JJ., dissent and would indefinitely suspend respondent.

_____

Scott J. Drexel, Disciplinary Counsel, and Stacy Solochek Beckman, Assistant Disciplinary Counsel, for relator.

Montgomery, Rennie & Jonson, L.P.A., and George D. Jonson, for respondent.

_____