[Cite as *State v. Gillis*, 2024-Ohio-726.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|                               |     |              |
| ----------------------------- | --- | ------------ |
| STATE OF OHIO,                | :   |              |
| Plaintiff-Appellee,           | :   |              |
|                               |     | No. 112080   |
| v.                            | :   |              |
| TORRENCE A. GILLIS,           | :   |              |
| Defendant-Appellant.          | :   |              |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 29, 2024

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-664337-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl Mazzone, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

LISA B. FORBES, P.J.:

{¶ 1} Appellant Torrence A. Gillis ("Gillis") appeals the trial court's journal entry convicting him of voluntary manslaughter and having weapons while under disability. After reviewing the facts of the case and pertinent law, we affirm.

# I.  Facts and Procedural History

{¶ 2}  This case involves Gillis's convictions for the fatal shooting of Alex Lane ("Lane") on October 15, 2021, outside of the Regional Transit Authority ("RTA") rapid station on West 25th Street.  Following a bench trial, the court found Gillis guilty of voluntary manslaughter, a first-degree felony in violation of R.C. 2903.03(A), with firearm and forfeiture specifications; involuntary manslaughter, a first-degree felony in violation of R.C. 2903.04(A), with firearm and forfeiture specifications; aggravated assault, a fourth-degree felony in violation of R.C. 2903.12(A)(1), with firearm and forfeiture specifications; aggravated assault, a fourth-degree felony in violation of R.C. 2903.12(A)(2), with firearm and forfeiture specifications; and having weapons while under disability ("HWWUD"), a third-degree felony in violation of R.C. 2923.13(A)(3), with a forfeiture specification.

{¶ 3}  The trial court merged the voluntary manslaughter, involuntary manslaughter, and aggravated assault offenses and the state elected to sentence on voluntary manslaughter.  The court sentenced Gillis to three years in prison on the firearm specification to be served prior to and consecutive to eight to 12 years in prison for the voluntary manslaughter conviction.  The court further sentenced Gillis to 24 months in prison on the HWWUD conviction to be served concurrently.

{¶ 4}  It is from this order that Gillis appeals raising the following four assignments of error:

> 1. Appellant's convictions are against the manifest weight of the evidence because [the] record establishes appellant acted in self-defense and the convictions are otherwise against the manifest weight of the evidence.

2. The court erred by denying appellant's motion to dismiss in violation of appellant's due process rights under Article I, Section 10 of the Ohio Constitution and under the Fifth and Fourteenth Amendments to the United States Constitution.

3. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

4. Appellant's sentence is contrary to law because the imposition of an indefinite sentence is unconstitutional.

## II. Trial Testimony and Evidence

{¶ 5} At trial, the court heard from 11 witnesses. The following pertinent testimony and evidence was presented.

### A. Ronald Korp

{¶ 6} On October 15, 2021, Ronald Korp ("Korp") drove past the West Side Market and saw "the incident happen." Asked to explain what he observed, Korp testified that as he was heading toward Lorain Road,

> in the middle of the street there were two gentlemen * * * I seen a taller gentleman push a shorter gentleman. And the one guy had a backpack * * * and pulled out a gun. I seen a first shot, which the taller guy lunged backwards. He went backwards, but he came forward again. He shot him again, and that's when you seen the life go out of him.

As Korp drove past this incident, he looked in his rearview mirror and saw the shooter stand over the victim "and shoot him again while he was down."

{¶ 7} Korp agreed with the statement that the taller gentleman initiated contact with the shorter one. Korp did not see the shorter man throw any punches.

**B. John Daniels**

{¶ 8} John Daniels ("Daniels") was working as a security officer at the West Side Market on October 15, 2021. Daniels described the victim as "taller, bigger, heavier set" and in his fifties. The shooter was described as "young, about 25 to 27 * * *. Somewhat shorter."

{¶ 9} Daniels recalled that on the night of the shooting, "there had been a conflict b[etween] two gentlemen that had come out of the RTA rapid area from across the street. * * * And it didn't seem to be anything major, but just to be some type of minor conflict or disagreement or something that was going on, but [Daniels] couldn't make out what it was about." The dispute "seemed to progress a little bit to where they seemed to be a little bit angry at each other. And after just about a minute, minute and a half of talking back and forth, the older gentleman, taller and heavier, reached out and he smacked the younger gentleman right across the face." Daniels described the smack as with a "flat hand, open hand, and * * * right across the face."

{¶ 10} The two men "kept walking on down the street a little bit, and they argued some more. And the younger one came across the street to talk with the other guard" who worked a different section of the West Side Market. As the younger man spoke with the other security guard, the older man stood across the street "waiting patiently as if he was waiting for him to come back over and they would continue on."

{¶ 11} Daniels walked over to the younger man and the other security guard. The younger man told the security guards "that he had asked the other gentleman the time, and the taller, older gentleman * * * took offense to it, and he smacked him." The younger man told Daniels, "if he hits me again, I'm going to shoot him." At this point, the older man "was still waiting patiently across the street."

{¶ 12} Daniels returned to his car. The younger man "walked up to" the older man across the street. "[T]here seemed to be some more conflict" between them. Daniels was unsure what they were arguing about "but it didn't seem to be very violent [until] after like about a minute or so, the older gentleman again reached out," and "smacked" the younger man. "[A]t that point there was a slight delay, and the younger man took out what appeared to be a gun and pointed it at" the older man. The older man "stood there very stoically and tall, and he just stood there and looked. * * * When all the sudden he started shooting at the older guy." According to Daniels, the younger man shot approximately four times.

{¶ 13} The older man "started to bend over as if he had been punched in the stomach and started walking slowly a few steps at a time until he collapsed in a heap." The younger man "put his gun away * * * and nonchalantly started to walk away." "[H]e took about ten paces, stopped immediately, and did an about face. And at that point he took about another ten steps where the [older] man had collapsed, pulled his gun out, and shot him again." When the younger man took the final shot, the older man "was just laying there almost motionless, no action, no reaction."

### C. Lucas Green

{¶ 14} Lucas Green ("Green") was working as a security guard on the night Lane was shot. As Green was making his rounds around the West Side Market, he

> heard a gentleman upset. I didn't see him at first because I was on the side. And as I made my way to the actual street, then I seen him because he was yelling and screaming because somebody had assaulted him. You know, so as I walk up to the corner * * * asked him if he was all right, he said yeah. He said somebody assaulted him. * * * Said somebody punched him in the face. I was like, okay, well, you know, then I asked if he wanted me to call the police because I can't leave, but I can call the police. And he didn't wish for the police to be called.

{¶ 15} Green identified Gillis as the man who claimed to have been assaulted. Green testified that Gillis claimed he had been punched in the face "because he asked for the time. He was coming from the rapid station and asked for what time it was to another individual, and the other individual then assaulted him."

{¶ 16} Initially, while Gillis was explaining to Green what happened, Lane was standing across the street. Green described Gillis as "very upset" while they were talking. Gillis told Green that "he wasn't going to let [Lane] put his hands on him again." According to Green, Gillis said if Lane put his hands on him again, he was "going to kill him."

{¶ 17} While Green and Gillis were talking, "[t]he other individual approached us, and then they started arguing." Gillis told Lane, "don't touch me again, I'm telling you, don't touch me again." The two continued to argue and Gillis said "go ahead, hit me again. Think I'm playing, hit me again." Gillis "had his hands behind his back" and Lane "punched him in the face." After the punch, "the shooting started."

{¶ 18} Green heard the gunshots and saw both men fall to the ground. Gillis "got up and was standing there. [Lane was] still sitting on the ground at the time." Gillis "started walking off because he was mad. He said, I told you, I told you, I told you. I didn't want to do it, I told you."

{¶ 19} As Gillis walked away, Lane got up. At that point, Gillis "turned around and said something else" before Lane and Gillis started arguing again. According to Green, Lane told Gillis "that he won and that, you know, it was over with, go ahead. Then after that, more argument. Then gunfire." According to Green, when Gillis shot Lane for the second time, Lane was standing up and had not lunged at Gillis.

{¶ 20} After Gillis started shooting again, Lane "fell and then he was shot again, and he tried to get up and he was shot again." Gillis then "walked off * * * [t]owards the rapid station." At that point, Green called 911. A recording of that call was played in open court and admitted into evidence.

{¶ 21} Asked to describe Lane and Gillis physically, Green estimated that Lane was approximately 6'4" or 6'5" and weighed between 230-250 pounds. On the other hand, according to Green, Gillis was roughly 5'6" tall and weighed between 150-160 pounds.

### D. Dr. Dan Galita

{¶ 22} Dr. Dan Galita ("Dr. Galita") performed an autopsy on Lane. According to Dr. Galita, Lane was 61 years old, 6'3", and weighed 232 pounds at the time of his death. Lane suffered from "three gunshot wounds; one to the right

upper chest, one to the right back, and one to the right abdomen." According to Dr. Galita, each of the gunshots were fired from at least three feet away.

{¶ 23} The gunshot to Lane's chest was fatal "[b]ecause it lacerated the right subclavian artery and vein, and as a result [there] was a large amount of blood in the right chest cavity." The gunshot to Lane's back had both an entrance and exit wound. This gunshot entered "on the right side" by Lane's shoulder and exited towards the middle of Lane's back. Dr. Galita described the trajectory of this gunshot as right to left and downward. The gunshot to Lane's stomach also had an entrance and exit wound; it entered Lane's right side and exited on the left.

{¶ 24} Dr. Galita testified to the Lane's toxicology results, which showed that, at the time of Lane's death, Lane was drunk and high on cocaine. According to Dr. Galita, Lane "could" have been agitated and violent due to the presence of both cocaine and alcohol in his system.

### E. Ramon Lozada

{¶ 25} Ramon Lozada ("Lozada"), a supervisor at the West Side Market, testified that police officers contacted him to locate security-camera footage from the night of the Lane's death. However, none was available because the cameras had not been operable for some time. They were waiting for a new camera system to be installed.

### F. Cleveland Police Officer Testimony

{¶ 26} Detective Larry Smith ("Det. Smith") testified regarding surveillance-camera footage obtained by the police. Three videos were played in open court and

admitted into evidence. One video displays different angles inside the West 25th RTA rapid station. The interior angles are labeled "West 25th Center Stairs," "West 25th Platform," and "West 25th Bridge." A second video from the West 25th RTA rapid station displays three angles of the entrance, which are labeled "West 25th North Entrance 1," "West 25th North Entrance 2," and "West 25th Common Area." Finally, a video labeled "RTCC Video" shows real time camera footage that depicts a "parking lot that's on the south side of 25th facing north." None of the videos include any audio.

{¶ 27} According to Det. Smith, based on the video footage, the interaction between Lane and Gillis began at approximately 3:05 a.m. RTA videos of the interior of the rapid station show Lane emerging from an elevator. Lane walks behind "Gillis sitting on the * * * first set of benches" to the "opposite set of benches." Gillis stands up and walks "towards [Lane. Lane] is walking away from him, sitting down at the bench. Gillis then walks "back to his original location" before "reengag[ing]" Lane. At that point, Lane "gets up" and "[t]hey start pushing each other."

{¶ 28} At 3:11 a.m., Gillis is seen "running up the steps." Lane follows him. At the top of the stairs, Gillis walks across the "West 25th Bridge" portion of the rapid station and towards the entrance at "Gehring and 25th to where he can exit the rapid station. He's walking out on his own * * *." At 3:12 a.m., Gillis walks back onto the "West 25th Bridge" portion of the rapid station, and "has a gun in his right hand" before placing it in his waistband.

{¶ 29} Video of "West 25th North Entrance 1" view shows Lane and Gillis "in the middle of the street" at 3:13 a.m. Lane is "walking away," and * * * Gillis is walking in the other direction * * *." Video of the "West 25th North Entrance 2" view depicts Gillis "walking Eastbound on Lorain," and "continuing eastbound towards the Carnegie bridge" at 3:16 a.m. This is the last time Gillis or Lane is seen in RTA videos.

{¶ 30} Next, Det. Smith identified the RTCC Video footage. Both Lane and Gillis are seen entering and leaving the frame, at times together and at other times apart. Nothing more is shown in the RTCC Video.

{¶ 31} According to Det. Smith, in addition to the videos played in court, police "attempted to get more videos from the West Side Market outside exterior cameras." However, they were "unable" to do so.

{¶ 32} At trial, Gillis stipulated "that the shell casings found at the scene were fired from the gun that was in [his] possession upon his arrest." Det. Smith also identified a report confirming that the four shell casings were fired from Gillis's gun. Consistent with the stipulation, the report was admitted into evidence.

**G. Torrence Gillis**

{¶ 33} Gillis testified that on the night Lane was shot, he "was out with * * * one of [his] friends." At "2 something in the morning" Gillis's friend dropped him off at the RTA rapid station on 25th Street. They had both been "drinking a little bit * * *"; Gillis had also smoked "half a blunt" that evening.

{¶ 34} According to Gillis, he fell asleep on the bench at the rapid station. He woke up when he heard Lane. When Gillis asked Lane what time the train would come, Lane responded hostilely. Gillis testified that he walked over to where Lane was sitting.

> I was over there talking to him, I get into the conversation with him. As I'm talking to him, he getting rowdy and all that. I move, walk away, and I come back over there after he tried to — I thought he cooled down because I just thought he was drunk. So I go back and I go talk to him, I'm like, Excuse me, OG, I said, I didn't mean no disrespect, I just did 15 and a half years and I don't know how the transit run so I was asking you. That's when he get — you see in the video, he moving his hands around like this. * * * When he was moving his hands, I'm going like this, like, you know, in the gesture, I don't want no problem, I just don't know what time the rapid come. I want to ask you.
>
> He jumped up, that's when he said I don't give a fuck how much time you just did. And then I was still standing, I'm like, OG, you tripping and stuff, and that's when the shoving got to going. I told him to quit shoving me. * * * [A]fter the shoving, actually that's when I end up walking away, because I'm trying to get away from him. * * *
>
> So I turn around, I get to walking. He get to following up behind me. I get to sidestepping so he wouldn't swing on me, because at this time when we was in the pushing match, I see he got a longer reach than I got, so I'm like, I ain't about to keep going back and forth with you. So I went to turned around and I started walking, he start following behind me.

Gillis described Lane as "bigger" than himself.

{¶ 35} As Lane was following Gillis, he said he was going to knock Gillis out. Gillis kept walking away. At one point, Gillis turned his head to look at Lane, Lane punched him three or four times in the head. At that point, Gillis tried to go up the stairs "to get away from him." Lane reached for Gillis's backpack and said he was going to knock Gillis out.

{¶ 36} Gillis explained that he ran up the stairs. When he got to the top of the stairs, he reached in his backpack and "put the gun into [his] waistband." Asked on cross-examination why he did not leave once he reached the top of the steps, Gillis responded, "Because I didn't have a reason * * *. He was up there threatening me. I turned around to stop him, because I wasn't about to be running around in the streets." Asked why Gillis put the gun in his waistband, Gillis responded: "[Lane] was threatening me, telling me now he'd take my gun and he'd kill me with my gun. Now it went from knocking me out to taking my gun and using it against me."

{¶ 37} Once Gillis and Lane exited the rapid station, they continued to argue. Gillis and Lane walked in separate directions but Gillis "turned around" and walked in Lane's direction "because [he was going] to walk over the bridge." At that time, Gillis noticed that Lane was "trying to flag some dudes trying to get [Gillis] draped off into a corner or something." As Lane was "trying to flag some dudes," Gillis saw Green at the West Side Market and went over to speak with him. According to Gillis, Green never asked Gillis if he wanted him to call the police. Gillis claimed that when Green testified to as much, he was "lying." Further, Gillis maintained that he never spoke to or saw Daniels the night of the shooting.

{¶ 38} As Green and Gillis were speaking, Lane walked back towards Gillis. Gillis put his hands behind his back as a "gesture that [he was] not a threat." Lane then punched Gillis two times in the face. Lane "started reaching at [Gillis's] side, like right where the gun would be at, because * * * at this time he knows exactly

where the gun" was and said he was going to "kill [Gillis] with [his] gun." Gillis blocked Lane with his right hand, grabbed the gun with his left, and "pulled the trigger and that's how [Lane] gets shot in his abdomen." As Lane fell to the ground, Gillis recalled the following: "he was pulling down on me and he tried to grab my leg. That's how I had blood on my pants leg, and I was trying to scoot back. As I'm trying to scoot back he start[ed] grabbing for me, and that's when the second shot" was fired. "After that, it was like a blur" and the next thing Gillis remembered was "walking over a bridge." Asked how he felt when Lane was trying to grab the gun, Gillis responded, "I was [in] fear for my life. I ain't never been scared like that in my life." Gillis could not explain why there were four shell casings at the scene because he only recalled firing the gun twice.

{¶ 39} On cross-examination, the following colloquy occurred:

Prosecutor: Let me get this straight, Mr. Gillis. You remember the first two shots because you were scared, and then you remember — after you were hit twice, and then you remember being arrested at the end of the bridge. But you don't remember the part in the middle where you turned around and shot him again, correct? I have your testimony correct?

* * *

Gillis: Everything was a blur. I told you after the second shot, that's when it went into a blur, sir. That's all I remember is walking across the bridge. That's what I said.

Prosecutor: I know. The part you're leaving out is where we see you turn around and come back and shoot again.

Gillis: The time where I turned around and shot, I didn't turn around and shoot. I was going — I was deciding whether I was going to walk this way or walking that way. You show me where you see me turn around and shoot this man.

### III. Law and Analysis

{¶ 40} For ease of discussion, we will address Gillis's assignments of error out of order.

#### A. Sufficiency of the Evidence

{¶ 41} In his third assignment of error, Gillis argues that "there is no evidence to establish the requisite mental states that Mr. Gillis acted knowingly or had any purpose[1] to kill or cause any harm to Lane." We disagree.

{¶ 42} Because Crim.R. 29 motions question the sufficiency of the evidence, "[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "A challenge to the sufficiency of the evidence supporting a conviction requires the court to determine whether the prosecution has met its burden of production at trial." *State v. Toby*, 8th Dist. Cuyahoga No. 106306, 2018-Ohio-3369, ¶ 19. That is, "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a

---

[1] While Gillis argues that the state presented insufficient evidence that he acted purposely, we note that Gillis was not convicted of a crime with a "purpose" as the required mental state.

reasonable doubt." *Jenks* at paragraph one of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 43} Gillis was convicted of voluntary manslaughter pursuant to R.C. 2903.03(A), which states: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." "Knowingly" is defined by R.C. 2901.22(B) as follows:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 44} On appeal, Gillis challenges only the mens rea element of his conviction for voluntary manslaughter. We find that the state presented sufficient evidence to support Gillis's conviction for knowingly causing Lane's death. Gillis testified that he shot Lane but argues that he did so in self-defense. Korp, Daniels, and Green each testified that they saw Gillis shoot Lane. This court has held that when a defendant admits to shooting the victim, but argues that he did so in self-

defense, the defendant "concedes that he knowingly killed" the victim. *State v. Amey*, 2018-Ohio-4207, 120 N.E.3d 503, ¶ 14 (8th Dist.)

{¶ 45} Gillis's third assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 46} Turning to his first assignment of error, Gillis argues that "[t]he court erred in failing to find Mr. Gillis acted in self-defense and because the convictions are otherwise against the manifest weigh of the evidence." We disagree.

{¶ 47} A challenge to the manifest weight of the evidence "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 48} Pursuant to R.C. 2901.05, self-defense is defined as follows:

> (B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the

accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 49} "Thus, the defendant bears the initial burden of production, which is the burden of producing evidence 'that tends to support' that the defendant used the force in self-defense." *State v. Ratliff*, 8th Dist. Cuyahoga No. 111874, 2023-Ohio-1970, ¶ 26, quoting *State v. Davidson-Dixon*, 2021-Ohio-1485, 170 N.E.3d 557, ¶ 18 (8th Dist.). *See also State v. Palmer*, Slip Opinion No. 2024-Ohio-539 ("A defendant is entitled to a self-defense jury instruction when he presents legally sufficient evidence for every element of a self-defense claim. This burden of production is de minimis and can be satisfied with the state's own evidence.").

{¶ 50} Once self-defense is at issue, the burden shifts to the state to prove, beyond a reasonable doubt, that the defendant did not act in self-defense by showing that he or she: (1) was at "fault in creating the situation giving rise to the affray"; (2) "did not have a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of force"; or (3) "must not have violated any duty to retreat or avoid danger." *State v. Jackson*, 8th Dist. Cuyahoga No. 108493, 2020-Ohio-1606, ¶ 17.

{¶ 51} Upon review, with regard to his assertion that he acted in self-defense, Gillis testified to the following: (1) Lane initiated the confrontation when he pushed and punched him, (2) he felt threatened because Lane was bigger, (3)

Lane threatened to take his gun, (4) he was in fear for his life, and (5) he acted in self-defense.

{¶ 52} Under R.C. 2905.01(B)(1), the burden fell to the state to prove, beyond a reasonable doubt, that Gillis did not act in self-defense by showing at least one of three factors. The first factor is whether Gillis was at fault in creating the situation giving rise to the affray. In assessing whether the defendant was at fault in a self-defense scenario, courts ask "in essence, whether the defendant was the initial aggressor." *State v. Gardner*, 8th Dist. Cuyahoga No. 110606, 2022-Ohio-381, ¶ 25. Ohio courts have held that "[t]his concept is broader than simply not being the immediate aggressor. [A] person may not * * * voluntarily enter an encounter and then claim a right of self-defense." *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002 Ohio App. LEXIS 329, 10 (Jan. 22, 2002).

{¶ 53} Here, when looking at the affray that led to Lane's death, the events happened as follows. Gillis walked over, by himself, to security guards at the West Side Market. Gillis explained to Green what transpired in the rapid station, and stated that if Lane hit him again, he was "going to kill him." Likewise, Daniels heard Gillis say "if he hits me again, I'm going to shoot him." Green testified that he offered to call the police and Gillis declined the offer. Both Daniels and Green recalled Gillis and Lane reengaged after Gillis communicated with the security guards. At that point, according to Green, Gillis put his hands behind his back and goaded Lane to hit him, saying to Lane, "Go ahead, hit me again. Think I'm playing, hit me again." Both Daniels and Green testified that Lane hit Gillis and Gillis responded by

shooting at Lane. Gillis then began to walk away, but instead turned around, returned to Lane and fired additional shots at Lane. Korp's testimony was consistent with the testimony provided by Daniels and Green.

{¶ 54} In light of the evidence presented at trial, we find that the state presented evidence establishing that Gillis was the aggressor at the time the shooting occurred. "Ohio courts have long recognized that a defendant is at fault in creating the situation giving rise to the affray when the defendant chooses to confront the victim or knowingly go to a place where the victim will be, even when the defendant's action was otherwise completely lawful." *State v. Elam*, 12th Dist. Butler No. CA2021-08-106, 2022-Ohio-1895, ¶ 15; *see also Ratliff*, 8th Dist. Cuyahoga No. 111874, 2023-Ohio-1970, at ¶ 29 (finding the defendant at fault for causing the affray when he fatally shot the victim after driving to the victim's house and imploring him to come outside to engage with him.).

{¶ 55} Moreover, the state established under the second factor, that Gillis was not in imminent danger of death or great bodily harm at the time he fired the second round of shots at Lane. The state presented evidence from the security officers and Korp that after the first round of gunshots Lane was lying on the ground. Gillis walked away, turned around, walked back toward Lane, and shot him again. That testimony established that Gillis no longer had "a bona fide belief" that he was in imminent danger of death or great bodily harm at the time he decided to return to where Lane was lying and fire additional gunshots into Lane.

{¶ 56} Upon review, we find that the state established beyond a reasonable doubt, and the factfinder did not clearly lose its way, in finding that Gillis did not act in self-defense. The evidence presented at trial supported conclusions that Gillis was at fault in creating the situation that led to Lane's death and did not have a bona fide belief that he was imminent danger of death or great bodily harm.

{¶ 57} Gillis further argues that his conviction for voluntary manslaughter is against the manifest weight of the evidence because "there is no evidence that he acted knowingly." We disagree.

{¶ 58} The factfinder did not clearly lose its way in finding that Gillis knowingly caused Lane's death because evidence in the record established that he shot Lane three times. As noted in his third assignment of error, evidence in the record, including Gillis's own testimony, established that Gillis shot Lane and, thus, he conceded that he acted knowingly. Therefore, after rejecting Gillis's self-defense argument, we find that this is not the exceptional case that weighs heavily against the conviction and warrants reversal.

{¶ 59} Gillis's first assignment of error is overruled.

**C. Motion to Dismiss**

{¶ 60} In his second assignment of error, Gillis argues that the trial court erred by failing to grant his motion to dismiss based upon his assertion that the state committed a *Brady* violation. We disagree.

{¶ 61} Pursuant to *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), "the suppression by the prosecution of evidence favorable to an

accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "Therefore, in order to establish a due process violation under *Brady*, the defendant must demonstrate that (1) favorable evidence, either exculpatory or impeaching; (2) was willfully or inadvertently withheld by the state; and (3) the defendant was prejudiced thereby." *State v. Buehner*, 8th Dist. Cuyahoga No. 109699, 2021-Ohio-4435, ¶ 38, citing *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004).

{¶ 62} When asserting a *Brady* violation, the defendant bears the burden of demonstrating that his or her due process rights were violated. *State v. Glover*, 2016-Ohio-2833, 64 N.E.3d 442, ¶ 35 (8th Dist.). "Whether a *Brady* violation is material is a question of law subject to de novo review." *Buehner* at ¶ 43. "Under a de novo standard of review, we give no deference to a trial court's decision." *Brownlee v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 97707, 2012-Ohio-2212, ¶ 9, citing *Akron v. Frazier*, 142 Ohio App.3d 718, 721, 756 N.E.2d 1258 (9th Dist.2001).

{¶ 63} In his motion to dismiss, Gillis argued that "the State violated [his] constitutional right to access evidence when it failed to preserve the video recordings of the incident. Mr. Gillis filed a Demand for Discovery, the State was on notice that the recording existed and was the basis for the Complaint, and the video recording was subsequently destroyed." In his motion to dismiss, Gillis asserted:

On May 16, 2022, at the hearing before the Court, the State indicated that Detective Loomis had reviewed the video from the West Side Market and determined that it had no value. On May 17, 2022, the State provided Counsel with a supplemental police report, written that day, which indicates that around October 15, 2021, the camera system at the West Side Market was in the process of being updated.

{¶ 64} We find that the court did not err when it denied Gillis's motion to dismiss because Gillis did not demonstrate that the state willfully or inadvertently withheld evidence. Gillis acknowledged that while the state notified him at one point that a police officer reviewed the video and determined it was of no value, the state subsequently provided a police report that indicated the cameras were not working the night Lane was shot. Gillis did not establish that the video existed in contravention to the police report. Accordingly, Gillis's motion did not establish that the state failed to preserve evidence because the motion acknowledges that the cameras were inoperable the day of the incident and thus there was no evidence to preserve. *See State v. Jury*, 2022-Ohio-4419, 203 N.E.3d 222, ¶ 17 (6th Dist.) ("[T]he state cannot suppress records that it does not have — and that have never been in the possession of a state agent.").

{¶ 65} Accordingly, under the unique facts of this case, we find that the trial court did not err when it denied Gillis's motion to dismiss.

{¶ 66} Gillis's second assignment of error is overruled.

**D. Reagan Tokes**

{¶ 67} Finally, Gillis argues that his sentence must be vacated because the imposition of an indefinite sentence pursuant to the Reagan Tokes Law is unconstitutional. Pursuant the Ohio Supreme Court's holding in *State v. Hacker*,

that the Reagan Tokes Law is constitutional in that on its face it does not violate the separation-of-powers doctrine, the right to a jury trial, or a defendant's due process rights, Gillis's fourth assignment of error is overruled. *State v. Hacker*, Slip Opinion No. 2023-Ohio-2535, ¶ 40.

**{¶ 68}** Gillis's fourth assignment of error is overruled.

**{¶ 69}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
SEAN C. GALLAGHER, J., CONCUR