[Cite as *State v. Amodei*, 2025-Ohio-4592.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                          No. 114763

    v.                                    :

ERIC BRYAN AMODEI,                :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 2, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-686293-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin M. Karkutt and Jordan Mason, Assistant Prosecuting Attorneys, *for appellee*.

Marein & Bradley, LLC, and Mary Jo Tipping, *for appellant*.

DEENA R. CALABRESE, J.:

{¶ 1} On October 30, 2024, a Cuyahoga County jury found defendant-appellant Eric Bryan Amodei ("appellant") guilty of murder, felonious assault, and discharge of a firearm on or near prohibited premises. The trial court entered

judgment in accordance with the jury's verdict and imposed a prison term. Appellant timely appealed, arguing that the trial court erred in refusing to instruct the jury on self-defense. Finding no merit to the appeal, we affirm.

## I. Facts and Procedural History

{¶ 2} This case involves a shooting on October 27, 2023, near the intersection of West 30th Street and Roanoke Avenue in Cleveland, Ohio. Appellant, who had been arguing with the victim while both walked along Roanoke, shot the victim seven times and left the scene. The victim perished at MetroHealth Medical Center less than an hour later. On November 2, 2023, the Cuyahoga County Grand Jury returned a six-count indictment charging appellant with the following offenses:

> Count 1: aggravated murder in violation of R.C. 2903.01(A), an unclassified felony;
>
> Count 2: murder in violation of R.C. 2903.02(A), an unclassified felony;
>
> Count 3: murder in violation of R.C. 2903.02(B), an unclassified felony;
>
> Count 4: felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree;
>
> Count 5: felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree; and
>
> Count 6: discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), a felony of the first degree.

{¶ 3} Counts 1 through 6 all carried one- and three-year firearm specifications pursuant to R.C. 2941.141(A) and 2941.145(A).

{¶ 4} On March 26, 2024, appellant filed a notice of self-defense pursuant to Crim.R. 12.2. The matter proceeded to a jury trial beginning October 21, 2024. For

purposes of this appeal, we focus on witness testimony and exhibits pertinent to appellant's argument that he was entitled to a jury instruction on self-defense.

{¶ 5} The shooting occurred shortly after 8:00 p.m. on October 27, 2023. The jury heard testimony from eyewitness Angel Amarro, who was visiting his father-in-law's house at 3202 Roanoke that evening. The home, which sits on the north side of Roanoke, was equipped with motion-activated security cameras, one pointed east (in the direction of West 30th) and the other west (in the direction of State Road). Amarro testified that he parked his truck in a vacant lot across the street from the home, remaining there to play with his young daughter while his son slept in the truck. He began to hear arguing coming from several houses away to his left as he faced the street (i.e., to the west), describing it as swearing and taunting. The arguing stopped, and the victim, whom Amarro had never met, crossed paths with Amarro as he walked east on Roanoke. Amarro testified that he was holding his daughter in his arms and that the victim apologized for swearing. The victim then continued east on Roanoke towards West 30th. Amarro testified that the victim appeared calm. Amarro never observed any weapons on the victim.

{¶ 6} The victim continued walking east toward West 30th, passing several homes. Amarro testified that the victim "was walking towards 30th and [appellant] started to walk down from 30th." (Tr. 442.) Amarro testified that appellant "approached [the victim] and then some arguing had started again." (Tr. 441.) He testified that based upon the language used, this argument and the previous argument down the street in the opposite direction appeared to be related. He

described it as "[j]ust a lot of cussing back and forth, threatening back and forth," and "taunting between the both of them back and forth." (Tr. 441 and 443.) Then, however, "the man that had approached [the victim] had pulled a gun on [the victim] and [the victim] yelled at [appellant] and he told him, you know, if you're going to shoot me, shoot me," and "you might as well shoot me and get it over with." (Tr. 441 and 443.) Amarro further testified:

> From that point it was a couple of arguments. [The victim] tried to walk away at that point and had said to the man, you're not going to shoot me and the man kept walking towards him and [the victim] turned around and told him if you're going to shoot me, then shoot me and took a couple more steps and the man fired the gun a couple of times.

(Tr. 442.) Amarro testified that the victim "did try to walk away," but "the man with the gun kept following him." (Tr. 443.)

{¶ 7} After the shooting, Amarro secured his daughter in his truck. Once he observed that appellant was no longer on the scene, he ran to render aid to the victim while yelling at his father-in-law and his wife to call 911. He did not observe any weapons near the victim, did not take anything from the victim, and did not see anyone else touch the victim other than personnel rendering aid.

{¶ 8} Video surveillance footage from the cameras at 3202 Roanoke captured a portion of the first argument. (State's exhibit No. 103(E).) The video depicted the victim walking eastbound on the opposite sidewalk, several houses west of 3202 Roanoke. While the audio is mostly indecipherable, the victim raised his voice and then made a brief detour into the street, gesturing with his hands to an unseen person or persons to the west. He moved back to the sidewalk, however, and

continued east on Roanoke. The motion-sensor footage ended before he crossed directly in front of 3202 Roanoke. Footage from another angle at the same household captured the gunshots. Amarro's truck is visible in the footage. The video also depicted Amarro running into the frame and yelling for his family to call the police. (State's exhibit No. 103(H).)

{¶ 9} The police also obtained surveillance footage from the residence at 3305 Roanoke, which sits on the south side of the street to the west of 3202 Roanoke (i.e., closer to State Road). The home sits directly across from 3304 Roanoke, situated on the north side of the street. Testimony indicated that a person residing at 3304 Roanoke had a son named "Sebastian" who was in a relationship with appellant's sister at the time of the incident.

{¶ 10} A resident of 3305 Roanoke, Daniel Matos, testified with respect to the footage and his observations. The first clip depicted a white sedan parking in front of 3305 Roanoke. (State's exhibit No. 104(A).) Matos testified that although he was sitting on the porch, he was minding his own business and did not notice the white sedan park in front of the house. A subsequent clip captured the victim walking on the sidewalk, left to right (i.e., west to east), directly in front of 3305 Roanoke. (State's exhibit No. 104(D).) Matos testified that he had seen "a guy come by and he started going back and forth with the guy across the street and they walked down." (Tr. 400.) Indecipherable arguing can be heard in three subsequent clips. Matos did not recognize the victim. While he testified that he thought the argument was between the victim "and the guy across the street," he denied knowing who,

across the street, the victim was arguing with. (Tr. 407.) The victim appeared to be "kind of drunk and stuff like that," but "[t]hey were just talking crap, so [Matos] didn't pay no mind to it." (Tr. 408.) Matos stood at one point because as the arguing continued, one or both individuals were "getting closer to . . . where my friend's kids were outside." (Tr. 409; State's exhibit No. 104(F).) He sat back down because "[t]hey quieted down," though the two "were still talking and stuff like that." When Matos sat down, the white sedan was still in front of his residence. (State's exhibit No. 104(G).)

{¶ 11} A person appearing to be wearing a dark shirt crossed the street and entered the driver's side of the white sedan. (State's exhibit No. 104(E)-104(G).)[1] In the final clip from 3305 Roanoke, the white sedan pulled away. (Tr. 410; State's exhibit No. 104(H).) Matos testified that he did not see the person getting in the sedan, but it "was a little bit after, after this video" that he heard gunshots. (Tr. 410.)

{¶ 12} Video obtained from a home at 3009 Roanoke captured the fatal shooting, as well as the moments leading up to it. (State's exhibit No. 2(A)-2(C).) The video, which has no audio, depicted the victim walking on the sidewalk down Roanoke toward West 30th, on the south side of the street. Appellant was holding a Glock 45 9 mm semiautomatic pistol. In the first frame, appellant was in the middle of the street with the firearm in his right hand, but lowered to his side. The victim was at that point further west on Roanoke and on the sidewalk. As the victim

---

[1] A police detective later testified that in her opinion, in listening to the audio of State's exhibit No. 104(G), "you hear it sounding as he's [sic] saying, Hold up there. Hold up there, E." (Tr. 812.)

continued east down the sidewalk, appellant walked towards the victim — in other words, advanced towards the victim and away from West 30th — and activated a flashlight affixed to the firearm. He then raised the firearm and pointed it at the victim, illuminating the victim with the light. Appellant deactivated the flashlight with the gun still raised, racked the slide, pointed the gun directly at appellant, and activated the flashlight again. With the flashlight illuminating the victim once more, appellant continued to advance towards the victim, almost reaching the tree lawn, while the victim remained on the sidewalk.

{¶ 13} The victim continued walking on the sidewalk toward West 30th, passing appellant, who remained in the street but near the tree lawn. Appellant, still with his gun pointed at the victim, walked parallel to the sidewalk, following the victim's eastward path and remaining close to the tree lawn. He then lowered his weapon to his side. The two continued walking toward West 30th, with appellant's weapon still lowered to his side. Appellant was close to the tree lawn, and the victim was on the sidewalk. They continued walking in the same direction, and the victim stopped on the sidewalk. At this point, the surveillance camera's view of the victim was obscured by a pillar. An automobile going westbound on Roanoke crossed West 30th and began to continue up the street. Appellant nevertheless began to back into the street. The victim then returned into camera view, moving very rapidly towards appellant. Appellant scurried backwards and began firing.

{¶ 14} The victim collapsed to the ground. The surveillance video then showed appellant leaving the scene by walking to West 30th and proceeding southbound. The victim sustained seven gunshot wounds and perished.

{¶ 15} Appellant met with his girlfriend the same evening and turned himself in to Cleveland police. While he and his girlfriend allegedly told conflicting stories about who drove to the police station, detectives ultimately determined from jail calls and text messages that appellant drove a white Acura sedan.

{¶ 16} Appellant testified at trial. Prior to recounting the night of the shooting, he testified that in 2020 he had intervened in a dispute between a man and woman outside a store, and that that the man, who had never been prosecuted, "stabbed [him] in the right side of [his] chest and [his] lung collapsed." (Tr. 931.) Appellant testified that he lost a lot of blood and "lost consciousness," ultimately awakening at a hospital. (Tr. 931.) He spent "a good period of time there" and was eventually sent home "with a bag to continue draining the blood" from "internal bleeding." (Tr. 931.) He testified to continuing anxiety regarding the incident.

{¶ 17} Appellant further testified that he and the victim had never met. Appellant testified that the evening of the incident, a Friday, his sister's boyfriend Sebastian called him to help hang some interior items at his "new place in the Old Brooklyn area." (Tr. 934.) He claimed he did not know exactly where the residence was located, even though he had been there once before — as a passenger in a U-Haul — to help them move some heavier items.

{¶ 18} According to appellant, he told Sebastian he would come over after work and would call to get the address once he was headed in that direction. (Tr. 935.) Sebastian, however, said he would call appellant "as soon as he got back home." (Tr. 935.) Appellant testified that he parked on West 30th to wait for Sebastian's call. He got out to smoke a cigar because it was his mother's car, and she suffers from asthma. He "just began to walk," turning left (westbound) on Roanoke. (Tr. 937.) At some point, he realized he had left his cell phone in the car. As a result, while he "was a few houses up into [Roanoke]," he "began walking back towards the car." (Tr. 937.)

{¶ 19} It was at this point, according to appellant's testimony, that he first encountered the victim. He claimed he had heard "some mumbling and stuff" coming from further down the street before the encounter. (Tr. 938.) Appellant testified that he started out on the opposite sidewalk from the victim, but ultimately "was going out of somebody's driveway to cross the street to go back toward [his] car on West 30th." (Tr. 937-938.) The two "locked eyes," and the victim reportedly "began to state . . . what the F was [appellant] looking at and things like that." (Tr. 938.) They then began to argue back and forth, with appellant believing the victim was intoxicated.[2] Appellant testified that he told the victim he did not know what his problem was, and that the victim said "that his problem would become

---

[2] Toxicology confirmed that the victim had a blood-alcohol concentration of 0.273, as well as marijuana in his system.

[appellant's] problem." (Tr. 938.) "And from there," appellant testified, "we began to go back and forth." (Tr. 938.)

{¶ 20} Appellant testified that at that point he was in the street and the victim was still on the sidewalk. According to appellant, the victim stated that "it was best for [appellant] to keep on going . . . or he was going to F me up and things of that nature." (Tr. 938.) Appellant testified he became defensive, clarifying that then he was "in the middle of the street a little bit ahead of" the victim, with the victim behind him. (Tr. 938.) Appellant continued:

> So I become defensive at this point and I'm just, you know, keeping aware of my surroundings and watching him. And at that point we're just going back and forth a little bit, and he mentioned at this point that he would — as the argument is going, he mentioned at that point that, you know, if I didn't want to get stabbed the F up that I would keep going, that it was best for me to keep going. And at that point I take my firearm out of my holster[.]

(Tr. 939.)[3] Appellant then unholstered the firearm and turned on the attached flashlight "due to the threat of the stabbing." (Tr. 940.) He testified that he pointed the firearm at the victim.

{¶ 21} At that point, according to appellant, the victim "begins to just like keep walking, you know, in the same direction as me." (Tr. 940.) The victim taunted him, saying, "[S]hoot me, if you're going to shoot me you would have done it already." (Tr. 940.) Appellant testified that he pointed the flashlight and racked the

---

[3] While he had purportedly forgotten his phone, appellant had remembered to take his firearm, which he kept "in the glove box." He testified that when he exited the car, he removed it from the glove box and "put it on [his] hip." (Tr. 939.)

slide and that the victim continued saying "shoot me," taunting appellant that if he meant to do so he would have done it already. (Tr. 940.) Appellant testified that he told the victim "that [he] was going to defend himself." (Tr. 940.)

{¶ 22} Appellant stated that he put the firearm back down to his side because he hoped that once the victim saw that he was armed, "he would just keep his distance and that things didn't have to go there." (Tr. 941.) He then testified:

> [The victim] mentioned that he had a knife and that he would stab me. I was hoping that things didn't have to go that far, you know, and to that depth.
>
> So at that point, you know, once I lowered the firearm he just began to mouth things, you know, shoot me, you aren't going to shoot me, and calling me names still. And at that point he turned towards me, and lunged at me stating that he was going to kill me. And you can see that I jumped backwards and began to raise my firearm, begin firing, and still moving backwards because of the fear that I was in, you know. I had no choice but to begin to be defensive and defend myself.

(Tr. 941.) Appellant testified that "it was a verbal confrontation until it turned physical by the physical lunge towards me, you know. I tried to leave it at just the verbal until I had no choice to defend myself, you know, and that's what I tried to do." (Tr. 950.)

{¶ 23} Appellant explained his quick departure from the scene, testifying that he saw people emerge from their homes and did not know whether it might be "any of this man's family." (Tr. 942.) He claimed to continue on to his vehicle, parked on West 30th.

{¶ 24} On cross-examination, when asked whether he testified that he saw the victim wield a knife, appellant responded that the victim "just stated that he

threatened that he was going to stab me." (Tr. 958.) Confronted with the video showing the moments leading up to the shooting, beginning at the point when appellant was in the street, he testified on cross-examination that they "were already beginning to have confrontation at that point having exchanged words" and that "at this point" — referring to the video footage of him crossing the street and advancing towards the victim — "is when he mentioned that he was going to cause harm to me. So at that point I turned to him, and I began to engage in the conversation." (Tr. 960.) He continued:

> Q.     And at this point when the weapon is raised and the flashlight is shining, you see no knife, right?
>
> A.     No.
>
> Q.     *Just words, according to you?*
>
> A.     *Right.* And do I begin to fire at that point?

(Emphasis added.) (Tr. 961.) Pressed on the issue of seeing the victim in possession of a knife, appellant testified:

> Q.     Okay, well, I'm asking you now, sir. At the time that you cocked your weapon and flashed that light in his eyes, did he have a knife?
>
> A.     When I cocked the weapon and flashed the flashlight, I did not see the knife. As he lunged towards me, he was reaching for the knife and extending his arm towards me that you can see in the video.
>
> Q.     Right. After someone cocked a weapon, flashed a bright light in their face, and pointed a gun, right? That's when you say he pulled out a knife and lunged at you, didn't you?
>
> A.     *I said it was a verbal dispute.*
>
> . . .
>
> Q.     Who showed their deadly weapon first, you or [the victim]?

A.     I had the firearm.

(Emphasis added.)  (Tr. 966.)

{¶ 25} In short, on direct examination, appellant never stated that he saw any weapon, including a knife, in the victim's possession before drawing his firearm.  On cross-examination, he was asked multiple times if he observed a knife, and each time he replied that the victim had only threatened him with words.  At the conclusion of his testimony, all he could say was that the victim was "reaching for" an unseen knife when he lunged at him.  He further admitted, however, that even if the never-located knife existed, he was the first to display a deadly weapon, rack the slide of his semiautomatic handgun, and point it at the victim.

{¶ 26} Following the conclusion of testimony, the trial court engaged in extensive discussion on the record with respect to a self-defense instruction.  The trial court ultimately declined to instruct the jury on self-defense, explaining that it had reviewed numerous cases and narrowed its focus to the issue of which party was at fault in creating the situation giving rise to the affray.  It concluded that "the initial affray, in the Court's opinion, began when the weapon was pointed at [the victim] with the light on." (Tr. 991.)  It continued: "For that reason, I find that in review of all of *Palmer* and all the case law that has been published since *Palmer* was published, I believe that defendant has failed to meet the first prong of the self-defense jury instruction." (Tr. 991.)

{¶ 27} The jury returned a verdict of not guilty of aggravated murder as charged in Count 1, but guilty on all remaining counts of murder, felonious assault,

and discharge of a firearm on or near prohibited premises, along with all respective firearm specifications. The trial court subsequently sentenced appellant to an aggregate total of 27 to 28.5 years to life under the Reagan Tokes Law. This timely appeal followed.

## II. Assignment of Error

{¶ 28} Appellant presents a single assignment of error for our review:

> The trial court erred in refusing to instruct the jury on self-defense, in derogation of Defendant's right to due process of law, as protected by the Fifth and Fourteenth Amendments to the United States Constitution.

{¶ 29} Finding no merit to the appeal, we overrule appellant's assignment of error and affirm his conviction.

## III. Analysis

{¶ 30} We review the trial court's decision for an abuse of discretion. A trial court abuses its discretion when it "exercise[es] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "Because the trial court is in the best position to gauge the evidence before the jury, we will reverse the trial court's decision to deny a defendant's request for a self-defense jury instruction only if the trial court's 'attitude [was] unreasonable, arbitrary or unconscionable.'" *State v. Palmer*, 2024-Ohio-539, ¶ 22, quoting *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). *See also State v. Harris*, 2025-Ohio-2774, ¶ 12 (8th Dist.); *State v. Bell*, 2025-Ohio-2526, ¶ 20 (8th Dist.).

**{¶ 31}** The affirmative defense of self-defense is governed by R.C. 2901.05(B)(1). The statute provides:

> A person is allowed to act in self-defense . . . . If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense . . . the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense . . . .

**{¶ 32}** A self-defense claim under R.C. 2901.05(B)(1) includes three elements:

> "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger."

*State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

**{¶ 33}** This court recently summarized a defendant's burden of production in this context:

> Defendants are required to present qualitative, legally sufficient evidence supporting each element of self-defense before the State's burden of persuasion under R.C. 2901.05(B)(1) is triggered. *Palmer* at ¶ 19, quoting *Messenger* at ¶ 19, 25. A defendant's burden of production is satisfied when "'the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant.'" *Id.* at ¶ 20, quoting *id.* at ¶ 22, 25 ("This burden of production is 'not a heavy one and . . . might even be satisfied through the State's own evidence.'"). Only adequacy is considered when determining whether evidence is sufficient, persuasiveness is not: "The question is not whether the evidence should be believed but whether the evidence, if believed, could convince a trier of fact, beyond a reasonable doubt, that the defendant was acting in

self-defense." (Emphasis omitted.) *Id*. at ¶ 21, citing *Disciplinary Counsel v. Smith*, 152 Ohio St. 3d 337, 2017-Ohio-9087, ¶ 23, 96 N.E.3d 234, and *Messenger* at ¶ 25-26.

*Bell*, 2025-Ohio-2526, at ¶ 22 (8th Dist.). The elements of self-defense are cumulative; self-defense is therefore inapplicable to a defendant who fails to satisfy any one element. *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986). "In *Palmer*, the Ohio Supreme Court specifically held that trial courts do not err when they require defendants to present legally sufficient evidence for all elements of self-defense before affording them self-defense jury instructions." *Bell* at ¶ 22.

{¶ 34} Here, as in *Bell*, our analysis "begins and ends with the affirmative defense's first element: that the defendant was not at fault in creating the situation giving rise to the affray." *Bell* at ¶ 23. After viewing the evidence in a light most favorable to appellant and considering only its adequacy — in other words, crediting appellant's own testimony and setting aside any considerations of weight or credibility — we find that appellant's self-defense claim was not supported by sufficient evidence.

{¶ 35} To determine whether a defendant was "at fault" in a self-defense scenario, courts assess, "'in essence, whether the defendant was the initial aggressor.'" *State v. Gillis*, 2024-Ohio-726, ¶ 52 (8th Dist.), quoting *State v. Gardner*, 2022-Ohio-381, ¶ 25 (8th Dist.). "This concept is broader than simply not being the immediate aggressor. A person may not *provoke an assault* or *voluntarily enter an encounter* and then claim a right of self-defense." (Emphasis added.) *State v. Gaston*, 2013-Ohio-2331, ¶ 16 (8th Dist.), quoting *State v. Nichols*, 2002-Ohio-

415 (4th Dist.). Indeed, "'Ohio courts have long recognized that a defendant is at fault in creating the situation giving rise to the affray *when the defendant chooses to confront the victim* or knowingly go to a place where the victim will be, even when the defendant's action was otherwise completely lawful.'" (Emphasis added.) *Gillis* at ¶ 54, quoting *State v. Elam*, 2022-Ohio-1895, ¶ 15 (12th Dist.). *See also State v. Hoskin*, 2022-Ohio-3917, ¶ 57 (8th Dist.). The first prong of the self-defense test, therefore, "requires a defendant to show that he did 'not engage in such wrongful conduct toward his assailant that the assailant was provoked to attack the defendant as he did.'" *Gaston* at ¶ 16, quoting *State v. Gillespie*, 2007-Ohio-3439, ¶ 17 (2d Dist.).

{¶ 36} Appellant testified that the victim started their verbal argument on Roanoke, after which the two went back and forth trading insults and threats. Giving full credit to that testimony, however, the threats made by the victim — even those referencing appellant being stabbed — were purely verbal. Appellant nevertheless voluntarily entered the encounter, not only choosing to confront the victim but also introducing deadly force by drawing a semiautomatic firearm, racking the slide, and leveling his gun at the victim. According to appellant's own testimony, the victim had not displayed a knife. Appellant and the victim were walking in the same direction down Roanoke, but appellant did not testify that the victim was following him or moved in his direction. Video footage plainly shows the victim on the south sidewalk, away from appellant and continuing his eastbound trajectory.

{¶ 37} Furthermore, appellant did not testify that the victim made any threatening gestures before appellant drew his firearm. Again, it was apparent from the video footage, as well as appellant's own testimony, that the victim was continuing his walk eastbound on Roanoke and was remaining on the sidewalk. It was appellant who closed distance by drawing his gun and walking towards appellant. The video shows him taking four steps in the opposite direction of his stated destination (West 30th Street) in order to close ground on the victim. Even then, the victim passed appellant and remained on the sidewalk, walking away from appellant. Appellant nevertheless continued to follow the victim down Roanoke with his gun in his hand.

{¶ 38} This case contrasts with *State v. Mitchell*, 2023-Ohio-2604 (1st Dist.), in which the First District reversed a jury verdict rejecting the defendant's claim of self-defense. The court engaged in substantial discussion of the "at fault" element. Security video depicted the defendant with his hands to his side when the victim "took out his knife and thrusted it at him, prompting [defendant] to draw his gun." *Id.* at ¶ 21. The court found "that this critical development supports the position that [the victim], rather than [defendant], bore responsibility for commencing the affray." *Id.* The victim, who "brandished his knife in close proximity to" the defendant, thereby "escalated the situation from a verbal confrontation into a physical altercation." *Id.* at ¶ 22.

{¶ 39} Here, unlike *Mitchell*, appellant's own testimony suggested he was the party who escalated a verbal confrontation by advancing on the victim, drawing his

weapon, and pointing it at the victim. Prior to that point, according to appellant himself, "it was a verbal confrontation" or "a verbal dispute." (Tr. 950 and 966.) Appellant consistently testified that the victim had not displayed a knife or made a single threatening gesture before appellant drew his gun. Despite this, appellant "willingly advanced toward a potentially volatile situation." *State v. Crawford*, 2024-Ohio-691, ¶ 28 (12th Dist.). *See also State v. Walker*, 2021-Ohio-2037, ¶ 19-20 (8th Dist.) (Defendant was armed, with nothing preventing him from taking a defensive stand while the danger subsided; instead he "escalated the altercation by voluntarily advancing and using a deadly weapon."); *State v. Sekic*, 2011-Ohio-3978, ¶ 15 (8th Dist.) (defendant cannot claim self-defense when he "willingly advanced toward a volatile situation"); *State v. Kyle*, 1989 Ohio App. LEXIS 1751, *10-11 (8th Dist. May 11, 1989) (even if victim was initial aggressor in altercation, defendant created or escalated conflict by approaching and confronting victim); *Martin v. State*, 2022-Ohio-2580, ¶ 26 (8th Dist.); *State v. Wagner*, 2015-Ohio-5183, ¶ 21 (3d Dist.) (Victim initially created the situation giving rise to the affray, but defendant escalated the situation from a verbal confrontation to a physical altercation.).

{¶ 40} The trial court was well within its discretion in concluding that by closing distance, pointing his firearm, and racking the slide at a victim who continued to stay on the opposite sidewalk and walked away from him, appellant had failed to produce sufficient evidence to satisfy the first element of self-defense. *See Bell*, 2025-Ohio-2526, at ¶ 25 (8th Dist.) (affirming denial of self-defense instruction because defendant "voluntarily entered an encounter with [his neighbor]

and escalated the dispute," and was therefore "at fault in creating the situation giving rise to [the] affray.").

{¶ 41} In this case, as in *State v. Smith*, 2024-Ohio-2811 (8th Dist.), "[t]he video suggests that had appellant not advanced toward and confronted the victim, no violence would have ensued." *Id.* at ¶ 12. We recognize that in *Smith*, unlike here, the jury received a self-defense instruction and deliberated accordingly. This court's observation in *Smith* is nevertheless instructive, especially when we review the video footage of the fatal confrontation in light of appellant's own testimony. Even accepting appellant at his word, nothing suggests that violence would have ensued had appellant not moved toward and confronted the victim with a deadly weapon. Instead, the appellant's own testimony confirmed that he advanced on and engaged in wrongful conduct toward the victim, thereby provoking attack. *Gaston*, 2013-Ohio-2331, at ¶ 16 (8th Dist.).[4]

{¶ 42} Appellant was required to present legally sufficient evidence for all three self-defense elements to receive a corresponding jury instruction. On this record, the trial court did not act unreasonably, arbitrarily, or unconscionably when it found that appellant failed to satisfy his burden of production on the first element.

---

[4] The issue of fault, tied here to appellant's decision "to advance toward" and confront the victim, is unaffected by the "stand your ground" law, R.C. 2901.09(B), which eliminates the duty to retreat if a person is in a place they lawfully have a right to be. *State v. Warth*, 2023-Ohio-3641, ¶ 33 (1st Dist.). "[T]he statute only prohibits fact finders from considering evidence involving the possibility of retreat to determine whether the defendant's belief that force was necessary was reasonable. Fact finders may, however, consider retreat evidence to determine who was at fault in creating the situation leading to the affray." *Id.* at ¶ 31, citing *State v. Hughkeith*, 2023-Ohio-1217, ¶ 88 (8th Dist.).

We therefore "need not consider the other two elements to resolve this appeal." *Bell* at ¶ 26. The trial court did not abuse its discretion when it declined to instruct the jury on self-defense. Appellant's sole assignment of error is overruled.

{¶ 43} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

EILEEN A. GALLAGHER, A.J., and
MICHAEL JOHN RYAN, J., CONCUR